UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>VALENTINO JOHNSON,<br>Defendant. | Case No. 14-cr-00412-TEH<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |

Now before the Court is Defendant Valentino Johnson's motion to suppress evidence. After reviewing the briefs and supplemental filings of both parties, in addition to the testimony presented at the evidentiary hearing held on December 9, 2014, the Court hereby DENIES Defendant's motion for the reasons set forth below.

**FACTUAL BACKGROUND**

On February 2, 2014, officers with the San Francisco Police Department ("SFPD") responded to 905 Missouri Street in San Francisco, California, after receiving a phone call from Defendant's girlfriend claiming that he called her threatening to (and actually did) kill himself at that address. Ex. A to Lynch Decl. at 158-159 (Docket No. 18-1). Upon arriving at the scene, dispatch informed Officer Wise that Defendant did not live at 905 Missouri Street. Def.'s Dec. 9, 2014 Evid. Hr'g Ex. 3 at 4:21-23; Dec. 9, 2014 Evid. Hr'g Tr. 81:7-18 (Wise) (hereafter "Hr'g Tr."). As Officer Wise and his partner approached the residence, they observed Defendant looking out of, and then retreating from, an upstairs window. Ex. A to Lynch Decl. at 54 (Docket No. 18-1); Hr'g Tr. 93:13-21 (Wise), 109:25-110:7 (Vannucchi). After making contact with Defendant and McAlpine, who is a resident of 905 Missouri Street and friend of Defendant, Officer Wise placed Defendant in handcuffs because of his parole status and the nature of the call. *Id.*; Hr'g Tr. 88:9-17 (Wise). At no time was McAlpine placed in handcuffs or otherwise taken into custody.

1    Additionally, McAlpine did not see Defendant placed in handcuffs.  Hr'g Tr. 29:20-21
2    (McAlpine).
3         At the evidentiary hearing and in his incident report, Officer Wise claims that he
4    asked both McAlpine and the Defendant who lived at the home, and that both of them
5    responded that McAlpine, McAlpine's daughter, and Defendant lived in the house.  Ex. A
6    to Lynch Decl. at 54 (Docket No. 18-2); Hr'g Tr. 95:5-14 (Wise).  McAlpine testified that
7    she told the officers that she lived in the house with her daughter, and that she was not
8    "sure if [she] directly told them that he lived there or if he was paroled there," but that she
9    did say "something about Mr. Johnson, either living or being paroled to 905 Missouri[.]"
10   Hr'g Tr. 49:14-25 (McAlpine).
11        At this point, approximately four more officers had arrived on the scene, although
12   only Officers Wise and Cader continued to speak with McAlpine and Defendant.  Hr'g Tr.
13   27:7-13 (McAlpine); 86:10-12 (Wise).  The officers did not have their guns drawn and
14   were nice to McAlpine during their brief conversation.  *Id.* 31:18-19, 50:21-22
15   (McAlpine).  Officer Wise testified at the evidentiary hearing that, without any mention of
16   a parole search, he informed McAlpine, "I want to search your house," or, "We want to go
17   in there and make sure there's nobody hurt and that there's no guns and that there's, you
18   know, nothing crazy going on inside your house."  *Id.* 89:4-17 (Wise).  He further testified
19   that he then asked McAlpine, "Is it okay if we search your house?", to which McAlpine
20   responded, "Yeah, that's okay; that's fine."  *Id.*  Officer Cader corroborated this testimony.
21   *Id.* 123:20-124:7 (Cader).  Conversely, McAlpine testified that Officer Wise told her that
22   "[t]hey [had] to do a parole search."  *Id.* 27:7-28:3 (McAlpine).  And, while she initially
23   claimed that the officers did not ask her permission to search the home, on cross
24   examination she testified that she actually could not remember whether they made such a
25   request.  *Id.* 31:11-13, 50:6-16 (McAlpine).
26        After this exchange, Officers Wise and Cader waited outside with Defendant and
27   McAlpine as other officers began a warrantless search of the home.  *Id.* 27:19-20
28   (McAlpine).  According to testimony at the evidentiary hearing, these officers were told

that they were conducting a parole search. *Id.* 113:8-15 (Vannucchi), 120:16-23 (Cader), 131:3-6 (Ortiz). As the search continued, Sergeant Plantinga secured McAlpine's signature on a form providing written consent for the search that was already underway. *Id.* 142:5-8 (Plantinga). As the search progressed, officers discovered a 9 mm handgun in the closet of McAlpine's daughter's room, where Defendant was allegedly not allowed. *Id.* 13:19-20 (McAlpine).

After the police discovered the gun, Defendant was arrested, and his cellphone was confiscated. Defendant later indicated to the Sergeant that the cellphone was his, that he always had it with him, and that he had owned the phone for a couple months. Ex. A to Lynch Decl. at 000047 (Docket No. 18-1). Three days later, Sergeant Jonas inspected the phone and discovered two incriminating text messages, one seeking clips for a 9mm PT-92 Taurus, and another asking whether someone had the gun's missing clip. *Id.* The gun seized at 905 Missouri Street was a PT-92 Taurus 9mm handgun with a missing magazine. *Id.*

**PROCEDURAL BACKGROUND**

The San Francisco District Attorney's Office filed a criminal complaint against Defendant, which was later dismissed in favor of this federal prosecution. On July 31, 2014, Defendant was indicted for Felon in Possession of a Firearm under 18 U.S.C. §§ 922(g)(1) and 924(e). (Docket No. 9). On September 8, Defendant filed the instant motion to suppress evidence. (Docket No. 17). Defendant also requested an evidentiary hearing, which was granted by the Court on September 30 (Docket No. 33). In connection with the evidentiary hearing, Defendant requested a number of Rule 17(c) subpoenas *duces tecum* for documents in the possession of the SFPD, including department manuals, related incident reports, and personnel files. (Docket Nos. 37, 38). The Government and the SFPD filed motions to quash the subpoenas (Docket Nos. 46-48, 51), which, after briefing and oral argument, were granted and denied in part on November 13. (Docket No. 59). On December 9, 2014, the Court held an evidentiary hearing on the motion to suppress,

3

1  after which the parties were invited to submit supplemental briefs, which the Court
2  received on December 23, 2014.  (Docket Nos. 82, 83).

**LEGAL STANDARD**

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).  Exceptions to the warrant requirement are "few in number and carefully delineated . . . ." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984).  "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).  A failure to meet this burden requires that all evidence illegally seized and derived from the search or seizure be excluded.  *Id.* at 416-17; *Elkins v. United States*, 364 U.S. 206, 223-24 (1960).

**DISCUSSION**

As is often the case, the constitutionality of the search in question depends largely on the details of the events that transpired at 905 Missouri Street on February 2, 2014.  Unsurprisingly, the Government and Defendant provide contrasting accounts of these events, especially on the key points of whether the responding officers asserted a right to search the home pursuant to the parole search exception, whether the officers asked McAlpine for consent to conduct a search, and whether McAlpine and Defendant told the officers that Defendant lived in the home.  In order to assess the credibility of the witnesses in this case and make the factual determinations necessary to conduct a constitutional analysis of the search in question, the Court held an evidentiary hearing on December 9, 2014.

At the hearing, the Court heard from seven officers with the San Francisco Police Department, all of whom provided testimony helpful to the Government's case, as well as Luana McAlpine, who testified on behalf of Defendant.  The Court weighed the credibility

of these witnesses in the context of other available evidence, and where the parties' accounts diverge, accepts the testimony of the officers over that of Defense witness McAlpine. This determination is made in part because of McAlpine's effort to mislead this Court, as well as the state court before it, regarding the nature of her relationship with Defendant. In state court, McAlpine testified that her relationship with Defendant was strictly platonic, testifying that she was referred to as Defendant's "aunt" because she had known him for eleven years. Ex. B to Lynch Decl. at 90:6-7, 100:10-17 (McAlpine) (Docket No. 18-3). At the evidentiary hearing before this Court, she doubled down on her deception, testifying that she had previously engaged in a romantic relationship with Defendant, but that it ended around 2007. Hr'g Tr. 59:11-21 (McAlpine). The Government then asked her about a number of jailhouse conversations that she had with Defendant, including one in which he asked her to marry him. *Id.* 60:13-62:15 (McAlpine). Repeating the testimony she gave in state court, she testified that she did not take the proposal seriously and considered it a "joke." *Id.* 62:6-9 (McAlpine); Ex. B to Lynch Decl. at 100:18-21 (McAlpine) (Docket No. 18-3). However, during the recorded conversation, which was played at the evidentiary hearing, Defendant asked McAlpine, "It's not - it's not a joke or a game, is it?", to which McAlpine responded, "Why would I say yes if I'm joking or whatever? . . . I've been told you I would marry you, Valentino." Gov.'s Hr'g Ex. 1. The phone calls go on to reveal illicit, sexual conversations between McAlpine and Defendant, providing clear evidence of an ongoing sexual and romantic relationship, contradicting her testimony to the Court. Hr'g Tr. 63:15-64:25; Gov.'s Hr'g Ex. 1.

It is in the context of this overwhelming lack of credibility and clear evidence of bias that the Court must consider McAlpine's testimony. By contrast, the Court was presented with no legitimate reason to doubt the veracity of the officers' accounts of the incident in question. Even had the Court admitted into evidence certain unsubstantiated citizen complaints proffered by Defendant, the police officers still emerge as more credible witnesses. Consequently, where the officers' accounts conflict with that of McAlpine, the

Court accepts the testimony of the officers and analyzes the constitutionality of the search accordingly. In doing so, despite the demanding standard and the great effort of defense counsel, the Court finds that McAlpine voluntarily consented to the police search of 905 Missouri Street, and that the officers additionally had probable cause to conduct a valid parole search of the residence.

## I.   Luana McAlpine Voluntarily Consented to the Search of 905 Missouri Street.

The Court first analyzes whether consent was given for the search of 905 Missouri Street, and thereafter whether the consent was given voluntarily.

### A.   Consent

It is a well-settled exception to the warrant requirement that an "individual may waive his Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of his person, property, or premises." *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000); *see also Georgia v. Randolph*, 547 U.S. 103, 106 (2006). "The existence of consent to a search is not lightly to be inferred." *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979).

As a preliminary issue, the Court finds that the written consent form signed by McAlpine is of no import to the consent analysis because p*ost-hoc* consent cannot cure a prior illegal search. *See United States v. Howard*, 828 F.2d 552, 556 (9th Cir. 1987) ("Because of the illegal entry into the . . . residence, [the owner's] subsequent consent to search the premises after the officers had entered the home was tainted and therefore invalid."). The Government has never argued otherwise. The existence of this form provides at best only minimal support for the contention that McAlpine had *earlier* consented to the search. Because the Court's finding of consent relies upon more conclusive evidentiary support, the Court will not consider the written consent form in its analysis.

As recounted above, Officer Wise testified that McAlpine told him that the officers could search her home. Hr'g Tr.89:2-17 (Wise). He further testified that she did not qualify her consent in any way or limit her consent to any portion of the house. *Id.* 98:25-99:1, 99:9-13 (Wise). This account was corroborated by Officer Cader, *Id.* 123:20-124:7 (Cader), and Officer Wise's police report, Def. Hr'g Ex. 5. Additionally, Sergeant Plantinga testified that, upon his arrival at the scene, he was told that verbal consent had already been given. Hr'g Tr. 145:5-14 (Plantinga).

Even putting aside McAlpine's lack of credibility, her testimony does not sufficiently contradict the officers' testimony that she gave verbal consent. On cross-examination, McAlpine testified that she did not remember whether the police asked if they could search her home. *Id.* at 50:11-14 (McAlpine) ("Q. Okay. So you don't know if they – do you not recall if they asked to search your house or did they not ask you to search the house? A. I don't remember now."). Further, the officers' account is supported by McAlpine's "calm" and "pleasant" demeanor during the search, as well as the fact that she did not voice any complaints about the search leading up to the discovery of the gun.[1] *Id.* 112:4-15 (Vannucchi), 146:14-147:7 (Plantinga). After considering the evidence, the Court finds that McAlpine gave verbal consent to the search of 905 Missouri Street.

### B. Voluntariness

It is not enough that McAlpine merely consented to the search of her house - she must have done so voluntarily and without coercion. The mere acquiescence to an assertion of police authority does not constitute voluntary consent, and cannot justify the failure to obtain a warrant. *See Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). Voluntariness of consent is always a "question of fact, and its resolution depends on the totality of the circumstances." *United States v. Morning*, 64 F.3d 532, 533 (9th Cir. 1995).

---

[1] This does not suggest that McAlpine's lack of objection *establishes* consent, but only that her conduct and demeanor comport with the claim that she had consented. *See United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990) ("[T]he government may not show consent to enter from the defendant's failure to object to entry.").

7

"Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact." *United States v. Page*, 302 F.2d 81, 84 (9th Cir. 1962). "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973). When conducting this analysis, courts commonly consider five factors, none of which is individually dispositive: "(1) whether [the consenting person] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the [consenting person] was notified that she had a right not to consent; and (5) whether the [consenting person] had been told a search warrant could be obtained." *United States v. Gomez*, No. 13-00282, 2014 WL 1089288, at *16 (N.D. Cal. Mar. 14, 2014) (citing *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007)).

The Court begins this analysis by considering the five factors enumerated in *Washington*. 490 F.3d at 775. Four of the factors weigh in favor of a finding of voluntariness, while only one supports Defendant's position. McAlpine, the consenting party, was not in custody. The officers did not have their guns drawn, and no *Miranda* warnings were given because they were unnecessary. Additionally, while the officers did not tell McAlpine that she had a right not to consent to the search, they also never intimated to her that a failure to consent to the search would be futile because they could obtain a search warrant. The Court finds that a consideration of these factors weighs heavily in favor of a finding that the consent was voluntary. Nonetheless, the Court also considers the six arguments made by Defendant regarding the totality of the circumstances surrounding McAlpine's verbal consent. *See Morning*, 64 F.3d at 533 (voluntariness is determined based on the totality of the circumstances).

First, Defendant argues that McAlpine's consent was not voluntary because at least six officers were present when police asked to search the home. Def.'s Supp. Brief at 2-3 (citing Hr'g Tr. 86:5-14 (Wise), 27:5-13, 31:5-7 (McAlpine)). However, McAlpine also

8

testified that only Officers Wise and Cader spoke to her, that they did not behave "in any way that was inappropriate," and that they were nice, even making a joke that caused Defendant and McAlpine to laugh. Hr'g Tr. 26:4-8, 50:17-51:9 (McAlpine). These facts cut against a finding of coercion.

Second, Defendant points out that he had been handcuffed in McAlpine's presence. Def.'s Supp. Brief at 3 (citing Hr'g Tr. 86:5-14, 88:10-17 (Wise)). However, McAlpine testified that she never saw the police put Defendant in handcuffs. Hr'g Tr. 29:20-21. McAlpine could not have been coerced by something of which she was not even aware. Further, McAlpine herself was not handcuffed or otherwise restrained when she gave verbal consent, and none of the officers had their weapons drawn or engaged in any inappropriate behavior. *Id.* 50:17-20 (McAlpine), 99:18-100:2 (Wise).

Third, Defendant argues that the conversation leading up to McAlpine's consent was brief. Def.'s Supp. Brief at 3-4. However, Defendant fails to explain, and the Court struggles to see, how this would be coercive. Just the opposite, it would seem that a short conversation would be less coercive than a long one, in which the officers might wear down a consenting party's resolve to withhold consent.

Fourth, Defendant claims that the officers told McAlpine that they were going to do (or had to do) a parole search, which made McAlpine feel that she had no choice but to consent to the search. Def.'s Supp. Brief at 4, 6 (citing Hr'g Tr. 27:5-13, 28:16-19, 31:5-13, 32:5-15 (McAlpine)). However, the Court does not find McAlpine's testimony to be credible, and instead accepts the officers' testimony that they did not mention a parole search before receiving consent from McAlpine. *See* Hr'g Tr. 87:18-88:17 (Wise), 116:20-117:8 (Cader). Further corroborating the officer's claim of voluntary consent was McAlpine's demeanor when she allowed the police to enter her home. Officer Wise testified that she was not crying or hysterical in any way, and appeared to understand what she was saying. *Id.* 100:3-11, 100:25-101:3 (Wise). Officer Cader's testimony corroborates this description, stating that McAlpine was "very calm, very pleasant," and that she "was going along with whatever the officer was doing." *Id.* 112:4-15 (Cader).

9

Further, McAlpine did not voice any complaints or become upset until near the end of the search, after the gun had been found. *Id.* 112:7-23. This does not sound like someone who is reluctantly acquiescing to the officers' authority.

Fifth, Defendant contends that McAlpine was subjectively vulnerable, and therefore unable to voluntarily consent. The Court is not convinced. First, Defendant points out that 905 Missouri Street is a form of public housing, and that McAlpine was "well aware that, under her lease agreement, she could lose her home if she got into trouble with law enforcement." Def.'s Supp. Brief at 5 (citing Hr'g Tr. 65:10-15 (McAlpine)). The Court notes that this citation does not actually support Defendant's contention. Instead, McAlpine only testified that she knew she could lose her housing *if a gun was found*. The Court is not moved by Defendant's speculation about McAlpine's thoughts. Second, Defendant contends that both he and McAlpine knew that Defendant had given this address to his parole officer even though he was not living there, and therefore that Defendant was in technical violation of his parole. *Id.* (citing Hr'g Tr. 43:6-11 (McAlpine)). Again, Defendant is speculating, as McAlpine only testified that she believed Defendant was paroled at her house, and that he used it as his official address for parole purposes - not that she knew this was a technical violation or that this influenced her decision to allow the police to search her home. Finally, Defendant observes that McAlpine had been in trouble with law enforcement in the past for misdemeanor petty theft. *Id.* (citing Hr'g Tr. 9:15-24 (McAlpine)). But again, McAlpine never claimed that this made her feel vulnerable when engaging with the police.

Defendant argues that all of these factors combine to create a "totality of the circumstances" in which "McAlpine was faced with a situation where she did not reasonably believe that she was free to resist the police's asserted desire to search her home." *Id.* at 6. However, nowhere does McAlpine *herself testify* that these factors (her housing situation, Defendant's technical parole violation, and her criminal background) were of particular concern to her in deciding whether to allow the police to search her house, or that they otherwise made her feel unable to withhold consent or object to the

10

search. Where McAlpine did not personally testify as to any sense of vulnerability resulting from these factors, the Court is not inclined to find that they resulted in a subjective sense of vulnerability that vitiated the voluntariness of her consent. Even had McAlpine testified to this effect, or should the record be construed to elicit such testimony, the Court would remain unconvinced. McAlpine is not a credible witness, and she has made clear that she is willing to mislead the Court to secure Defendant's release. Further, these "vulnerabilities" are not exceptional in the field of criminal law, and this Court is wary to create any precedent that living in subsidized housing, lying to authorities, or having a criminal record legally precludes individuals from being able to voluntarily consent to warrantless searches. To do so would improperly and unjustifiably hamper the ability of the police to conduct searches upon receiving affirmative consent, which is an important and constitutionally recognized tool of law enforcement.

Finally, Defendant notes that McAlpine thought she had "no other choice" but to consent to the search because she believed the officers were permitted by law to conduct a parole search. *Id.* (citing Hr'g Tr. 32:5-15 (McAlpine)). However, as previously explained, the Court accepts the officers' testimony that they made no mention of a parole search before asking to search the home. Consequently, McAlpine's consent was not obtained under "color of the badge" or through a "claim of lawful authority" made by the police. *See Page*, 302 F.2d at 84; *Bumper*, 391 U.S. at 49. As a result, McAlpine's purported (and in fact, correct) belief that Defendant's parole condition made the search of her house inevitable is without consequence.

Having rejected Defendant's arguments for coercion, the Court finds that the totality of the circumstances demonstrates that McAlpine gave voluntary consent for the search of her home. On this basis alone, the Court could find that the officers lawfully operated within a recognized exception to the warrant requirement. Nonetheless, the Court additionally finds that the officers conducted a valid parole search, with sufficient probable cause to believe that Defendant resided at 905 Missouri Street.

11

## II. The SFPD Officers Conducted a Valid Parole Search.

Before conducting a search based on a parole search condition, an officer must have "probable cause to believe that the parolee is a resident of the house to be searched." *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006), *overruled in part on other grounds*, *United States v. King*, 687 F.3d 1189 (9th Cir. 2012). Probable cause exists if an "officer of reasonable caution would believe, based on the totality of [the] circumstances, that the parolee lives at a particular residence." *United States v. Grandberry*, 730 F.3d 968, 975 (9th Cir. 2013) (internal quotation marks omitted). "There must be strong evidence that the parolee resides at the address." *Id.* at 975-76 (internal quotation marks omitted). However, "the determination of probable cause is based only on the totality of the circumstances known to the officers at the time of the search." *Id.* at 976 n. 6 (internal quotation marks and citations omitted).

Defendant asserts, and the Government has failed to pursue any disagreement, that he did not reside at 905 Missouri Street on February 2, 2014. Def.'s Supp. Brief at 8. The Court has its own reservations on this point. Defendant told officers that he moved out of his previous residence after being served with a restraining order by his girlfriend on January 30, and that he had been staying at 905 Missouri Street until his arrest on February 2. *See* Def.'s Hr'g Ex. 12 at 3:18-4:3 (Defendant); Hr'g Tr. 161:15-162:10-11 (Jonas). This is supported by McAlpine's account to Sergeant Plantinga that Defendant had been "laying his head" at 905 Missouri Street "[s]ince him and his girlfriend got broke up." Ex. C to Lynch Decl. at 7-8 (Docket No. 18-4). Further, Defendant had a key to the house, although it technically belonged to McAlpine's grandson. *Id.* McAlpine additionally testified that Defendant had moved his belongings, including his mail and prescription medication, from his girlfriend's apartment in Emeryville to 905 Missouri Street. Hr'g Tr. 53:5-8 (McAlpine); *see also* Ex. C to Lynch Decl. at 6 (Docket No. 18-4). However, McAlpine also testified that Defendant had only stayed at 905 Missouri Street for one night that week, which is consistent with what she told Sergeant Plantinga on the day of the search. Hr'g Tr. 13:7-13, 46:7-15 (McAlpine); Ex. C to Lynch Decl. at 7-8 (Docket

12

1    No. 18-4).  Despite the evidence that Defendant in fact resided at 905 Missouri Street, the

2    Court will not base its decision on actual residence, as this point was not pursued by the

3    Government.

4          Defendant argues that the officers did not have probable cause to believe that he

5    resided at 905 Missouri Street because they were informed by dispatch that this was not his

6    recorded address.  Def.'s Supp. Brief at 10 (citing Def.'s Hr'g Ex. 3 at 4:21-23).  While

7    Officer Wise confirmed that he received this message from dispatch, he explained that it

8    provided only one piece of information at his disposal in determining whether to conduct a

9    parole search.  Hr'g Tr. 81:7-18, 90:20-25 (Wise).  Defendant next contends that before

10   searching the home, the officers had access to a number of different databases, none of

11   which listed 905 Missouri Street as Defendant's residence.  Def.'s Supp. Brief at 1.

12   However, Officer Wise testified that he did not look at these records before searching the

13   home because he thought it unnecessary after Defendant and McAlpine both told him that

14   Defendant lived there.  Hr'g Tr. 92:17-24, 97:20-23 (Wise).  Finally, Defendant argues that

15   the officers should have engaged in a more thorough investigation into Defendant's

16   residence, for example by contacting his parole officer, checking the relevant databases,

17   etc.  Def.'s Supp. Brief at 10-12 (citing *Grandberry*, 730 F.3d at 978 n. 9).  However,

18   Officer Wise explained that he wanted to keep the conversation short in light of the

19   emergent nature of the call, which reported that someone was harmed inside the house and

20   that a gun was involved.  Hr'g Tr. 96:3-97:23 (Wise).

21         Despite having some merit, Defendant's arguments are outweighed by the fact that

22   he and McAlpine both told Officer Wise that he lived at 905 Missouri Street.  Ex. A to

23   Lynch Decl. at 54 (Docket No. 18-2); Hr'g Tr. 95:5-14 (Wise).  In response to this point,

24   Defendant argues that the dispatch communication and various database reports should

25   have led the officers to investigate the truthfulness of McAlpine's and Defendant's claim

26   that Defendant lived there.  Def.'s Supp. Brief at 10.  In support, Defendant cites *United*

27   *States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000), which states, "even if a person invites

28   law enforcement inside and explicitly asserts that he lives there, 'the surrounding

circumstances could [] be such that a reasonable person would doubt its truth and not act upon it without further inquiry.'"  In addition to being readily distinguishable on the facts, *Reid* was a case about apparent authority, which is a different standard than that for probable cause in the context of a parole search, and is therefore inapposite.  While Defendant cannot point to a single case where courts have found a lack of probable cause to conduct a parole search where the defendant or a co-resident identified the residence in question as that of the parolee, the Government correctly identifies a case where this District has found just the opposite.  Gov.'s Supp. Brief at 5-6.

In *United States v. Gomez*, the Court considered the four indicia of residence common to cases where a valid parole search was conducted.  2014 WL 1089288, at *15-16.  These indicia include: (1) the parolee did not appear to be residing at any address other than the one searched; (2) the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base; (3) the parolee had a key to the residence in question; and (4) either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee. *Id.* (citing *Howard*, 447 F.3d at 1265-66).  The *Gomez* Court found that the weakness of the first three factors in that case was outweighed by the fourth factor, *i.e.*, that the parolee's co-resident/landlord identified the residence in question as that of the parolee. *Id.* at *15.  Consequently, the Court held that the parole search was valid.  *Id.* at *16.

The reasoning of *Gomez* applies with even greater force in this case.  While the first three factors are similarly weak, either because they cut against the officers' assessment or because the officers were unaware of favorable facts at the time of the search, the fourth factor weighs exceedingly in favor of a finding of probable cause, as Defendant and McAlpine *both* told the police that Defendant lived at the house.  According a great deal of weight to this admission makes sense, as Defendant's reported address could have been, and in light of the restraining order indeed was, outdated.  Further, as explained by the court in *Howard*, "It will often be against a parolee's penal interests to admit to living at an unreported residence; such an admission is thus unlikely to be motivated by self-interest

14

and is therefore entitled to some credibility." 447 F.3d at 1266. McAlpine's statement and Defendant's admission that he lived at 905 Missouri Street, combined with the fact that the officers observed Defendant in the upstairs window, provided "strong evidence" that Defendant actually lived at the residence despite having a different reported address, a totality of circumstances sufficient for a finding of probable cause. *See Grandberry*, 730 F.3d at 975-76.

### III. The Search of Defendant's Cell Phone Was Proper.

Because the search of 905 Missouri Street was a lawful consent and parole search, the evidence found on Defendant's cell phone subsequent to his arrest, and otherwise pursuant to his parole search condition, will not be suppressed under the exclusionary rule.

### CONCLUSION

For the foregoing reasons, the Court finds that Luana McAlpine voluntarily consented to the search of 905 Missouri Street, and that the San Francisco Police Department otherwise conducted a valid parole search. Accordingly, the Court DENIES Defendant's motion to suppress evidence.

The Court FURTHER ORDERS that the parties shall appear before the Court for a status conference on February 9, 2015, at 2:30 P.M.

**IT IS SO ORDERED.**

Dated:  01/14/15                               _____
                                               THELTON E. HENDERSON
                                               United States District Judge