JODI LINKER
Federal Public Defender
Northern District of California
GABRIELA BISCHOF
SAMANTHA JAFFE
Assistant Federal Public Defenders
450 Golden Gate Avenue, Box 36106
San Francisco, CA 94102
Telephone:    (415) 436 7700
Facsimile:    (415) 436 7706
Email:        Gabriela_Bischof@fd.org
Email:        Samantha_Jaffe@fd.org

Counsel for Defendant JOHNSON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 14–00412 VC |
| Plaintiff, | **MR. JOHNSON'S POST EVIDENTIARY HEARING BRIEF AND MOTION FOR RELEASE** |
| v. | |
| VALENTINO JOHNSON, | **Court:** Courtroom 4, 17th Floor |
| Defendant. | **Hearing Date:** April 1, 2025 |
| | **Hearing Time:** 10:00 a.m. |

i

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Argument .............................................................................................................................. 2

    I.     Revocation is Not Warranted on Charges One Through Four ................................ 2

    II.    The Government Has Failed to Prove Charge Five. ............................................... 3

    III.   The Government Has Failed to Prove Charge Six. .................................................. 4

         A.    The fact that an object is a knife does not automatically make it a "dangerous weapon." ................................................................................. 4

             1.    There is no evidence that Mr. Johnson's pocketknife was designed to cause bodily injury. ........................................................... 6

             2.    The black knife is not a dangerous weapon. ............................... 6

             3.    The black knife did not become a dangerous weapon based on how it was used. ...................................................................... 7

             4.    The black knife did not become a dangerous weapon based on where it was found. ................................................................. 9

         B.    Finding that Mr. Johnson's possession of these two knives violated ................. 10

    Standard Condition #12 would violate the U.S. Constitution ......................................... 10

             1.    The condition is vague as applied to these knives. ................................. 10

             2.    The Government's interpretation violates the Second Amendment. ....... 11

    IV.   The Second Amended Form 12 is Defective and Should Be Dismissed. ....................... 12

         A.    Relevant factual background ................................................................... 12

         B.    Contrary to the Government's argument, it is improper for Probation to bring charges based on AUSA's arguments. ................................................ 14

         C.    The proper remedy is dismissal of the Form 12. ................................... 16

         D.    The Form 12 is based on knowing and reckless omissions of material fact. ....... 18

             1.    Officer Coppage violated *Franks*. ........................................... 20

             2.    When all the information is considered, there is no probable cause to believe Mr. Johnson committed Charge Seven .................................. 21

             3.    The proper remedy is to dismiss Charge Seven ..................................... 22

    V.    The Government Has Failed to Prove Charge Seven. .................................................... 23

A.    The admission of Dasia Johnson's hearsay statements violates *United States v. Comito.* ...................................................................................................24

    1.    Mr. Johnson has a compelling interest in confrontation. .......................24

    2.    The Government has not provided good cause for denying Mr. Johnson his Confrontation rights. .........................................................................25

    3.    The evidence introduced does not carry traditional indicia of reliability. ................................................................................................26

B.    The Government failed to prove the elements of assault with force likely to ....27

produce great bodily injury. ...............................................................................27

    1.    Dasia's statements were inconsistent and do not show that an assault by Mr. Johnson occurred..............................................................................28

    2.    No reliable evidence was introduced as to conduct inside the car.........28

    3.    The limited reliable evidence as to conduct outside the car does not show an assault likely to cause great bodily injury...............................29

    4.    The Government Failed to Prove that Mr. Johnson did not act in self-defense. ..................................................................................................31

C.    The Government cannot amend the Form 12 to charge a different offense .......31

after the close of evidence...................................................................................31

VI.    Mr. Johnson Cannot Be Incarcerated Past April 9th Without A Jury Finding of Guilt Beyond A Reasonable Doubt Under *Apprendi*. ..........................................................34

Conclusion .........................................................................................................................34

# TABLE OF AUTHORITIES

**Federal Cases**

*Alleyne v. United States*,
  570 U.S. 99 (2013) ............................................................................... 34

*Aloe Vera of Am., Inc. v. United States*,
  376 F.3d 960–65 (9th Cir. 2004) (per curiam) .............................. 16

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ........................................................................... 34

*Arnsberg v. United States*,
  757 F.2d 971–77 (9th Cir. 1985) ...................................................... 26

*Arpin v. Santa Clara Valley Transp. Agency*,
  261 F.3d 912  (9th Cir. 2001) ........................................................... 21

*Court. United States v. Dennis*,
  26 F.4th 922 (11th Cir. 2022) ........................................................... 33

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................................... 11

*Fouts v. Bonta*,
  718 F. Supp. 3d 1276 (S.D. Cal. 2024) ........................................... 11

*Franks v. Delaware*,
  438 U.S. 154–65 (1978) ............................................... 19, 20, 21, 22

*John v. City of El Monte*,
  505 F.3d 907 (9th Cir. 2007) ............................................................ 21

*Lombardi v. City of El Cajon*,
  117 F.3d 1117 (9th Cir.1997) ........................................................... 21

*Mills v. Graves*,
  930 F.2d 729 (9th Cir. 1991) ...................................................... 19, 20

*Moody v. St. Charles County*,
  23 F.3d 1410 (8th Cir. 1994) ............................................................ 19

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ............................................................................... 11

*Paez v. Mulvey*,
  915 F.3d 1276 (11th Cir. 2019) ........................................................ 19

*Prison Legal News v. Ryan*,
  39 F.4th 1121 (9th Cir. 2022) ........................................................... 12

*Schiff v. Dorsey*,
   877 F. Supp. 73 (D. Conn. 1994) ................................................................. 15

*Sherman v. U.S. Parole Comm'n*,
   502 F.3d 869 (9th Cir. 2007) ..................................................................... 19

*Taylor v. Meacham*,
   82 F.3d 1556  (10th Cir. 1996) .................................................................. 19

*U.S. v. Montgomery*,
   998 F.2d 1468 (9th Cir. 1993) ................................................................... 17

*United States v. Alston*,
   295 F. App'x 474 (2d Cir. 2008) .................................................................. 8

*United States v. Angle*,
   761 F. App'x 775 (9th Cir. 2019) .............................................................. 10

*United States v. Aquino*,
   794 F.3d 1033 (9th Cir. 2015) ............................................................... 2, 34

*United States v. Armour*,
   804 F.3d 859 (7th Cir. 2015) .................................................................... 11

*United States v. Berger*,
   976 F. Supp. 947 (N.D. Cal. 1997) .................................................. 14, 15, 16

*United States v. Carrillo-Carion*,
   373 F. Supp. 2d 1225–26 (D.N.M. 2004) ........................................... 15, 16

*United States v. Comito*,
   177 F.3d 1166 (9th Cir. 1999) ............................................................. *passim*

*United States v. Conn*,
   577 F. Appx. 724 (9th Cir. 2014) ............................................................. 17

*United States v. Enos*,
   453 F.2d 342 (9th Cir. 1972) ..................................................................... 9

*United States v. Evans*,
   883 F.3d 1154 (9th Cir. 2018) .................................................................. 10

*United States v. Garcia-Mejia*,
   394 F.3d 396 (5th Cir. 2004) .................................................................... 11

*United States v. Griffin*,
   294 F. App'x 393 (10th Cir. 2008) .............................................................. 8

*United States v. Guilbert*,
   692 F.2d 1340 (11th Cir. 1982) (per curiam) ................................... 5, 8, 9-10

*United States v. Hall*,
   419 F.3d 980 (9th Cir. 2005) ............................................................... 25, 26

*United States v. Hasting*,
   461 U.S. 499 (1983) ............................................................. 16

*United States v. Havier*,
   155 F.3d 1090 (9th Cir. 1998) ....................................... 32, 33

*United States v. Henderson*,
   998 F.3d 1071 (9th Cir. 2021) ............................................. 34

*United States v. Kay*,
   722 F. App'x 750 (9th Cir. 2018) ...................................... 10

*United States v. Lavender*,
   224 F.3d 939 (9th Cir. 2000) ................................................ 5

*United States v. Lefkowitz*,
   618 F.2d 1313 (9th Cir. 1980) ................................... 19, 20, 21

*United States v. Leichtnam*,
   948 F.2d 370 (7th Cir. 1991) ................................................ 6

*United States v. Martin*,
   984 F.2d 308 (9th Cir.1993) ........................................... 3, 26

*United States v. Matthews*,
   106 F.3d 1092 (2d Cir. 1997) ............................................ 5, 8

*United States v. Mejia-Sanchez*,
   172 F.3d 1172 (9th Cir. 1999) ......................................... 14, 15

*United States v. Mitchell*,
   572 F. Supp. 709 (N.D. Cal. 1983) ..................................... 17

*United States v. Owen*,
   580 F.2d 365 (9th Cir. 1978) ...................................... 16-17, 17

*United States v. Pangelinan, No. CR. 99-00001*,
   2007 WL 1175033 (D. Guam Apr. 23, 2007) ........................ 5

*United States v. Rahimi*,
   602 U.S. 680 (2024) ............................................... 10, 11, 12

*United States v. Ramirez*,
   710 F.2d 535 at (9th Cir. 1983) ........................................ 16

*United States v. Smith*,
   561 F.3d 934 (9th Cir. 2009) (en banc) ................................ 5

*United States v. Soltero*,
   510 F.3d 858 (9th Cir. 2007) (per curiam) ......................... 10

*United States v. Speed*,
  811 F.3d 854 (7th Cir. Jan. 19, 2016) ........................................................ 8, 11

*United States v. Stanert*,
  762 F.2d 775 (9th Cir.) ........................................................ 19, 20, 22

*United States v. Thomas, No. 06-CR-048-WMC-01*,
  2011 WL 4356231 (W.D. Wis. Sept. 16, 2011) ........................................ 5

*United States v. Thum*,
  749 F.3d 1143 (9th Cir. 2014)(a) ........................................................ 32

*United States v. Tumea*,
  810 F.3d 563 (8th Cir. Jan. 14, 2016) ................................................ 5

*United States v. Vargas-Amaya*,
  389 F.3d 901 (9th Cir. 2004) ........................................................ 18-19, 19

*United States v. W.R. Grace*,
  526 F.3d 499 (9th Cir. 2008) ........................................................ 16

*United States v. Wasielak*,
  253 F. App'x 822 (11th Cir. 2007) (per curiam) ................................ 5

*United States v. Welsh*,
  730 F. App'x 494 (9th Cir. 2018) .................................................... 10

*United States v. Wiley*,
  703 F. App'x 950 (11th Cir. 2017) (per curiam) .............................. 5

**State Cases**

*People v. Aguayo*,
  13 Cal. 5th 974 (2022)(a) ........................................................ 33

*People v. Johnson*,
  244 Cal. App. 4th 384 (2016) .................................................... 27

*State v. DeCiccio*,
  315 Conn. 79 (2014) ................................................................ 11

*State v. Delgado*,
  298 Or. 395 (1984) ............................................................ 11-12

1

2

## INTRODUCTION

Valentino Johnson has a well-documented substance abuse problem and wants treatment. Mr. Johnson did not contest that he was using in early 2024 and was not sober when he entered New Bridge in March 2024. *See* Charge 1, Dkt. 394.  Without a preceding period of abstinence, he was unable to conform to the demands of the program, despite his desire to get clean. He did not contest that he left New Bridge residential treatment, returned to New Bridge, used in the program, and left again, ultimately absconding from Probation supervision until his arrest in October 2024. Charges 2-4, Dkt. 394. He has now been in custody for five months.

The primary reason Mr. Johnson has not been released to treatment during this period is the severity of the state law allegations against him: forcible rape and weapons possession (Charges Five and Six, added to the Form 12 on October 30, 2024, Dkt. 363) and assault with force likely to cause bodily injury allegation (Charge Seven, added to the Form 12 at the government's request on February 14, 2025, Dkt. 394). The Court has made its indicated ruling on the forcible rape and weapons allegations in Charge Five.[1] Mr. Johnson submits this briefing to flesh out the reasons the government failed to meet its burden on the remaining charges and to answer the Court's outstanding questions at the conclusion of the evidentiary hearing.

With regard to Charge Six, the government failed to prove the dangerous weapon charge because 1) the only weapon identified by law enforcement and entered into evidence is a "multi-tool" pocket knife; 2) possession of the multitool *or* the other alleged knife does not violate Mr. Johnson's supervision condition, and 3) on these facts, a violation would render the condition overbroad and unconstitutionally vague and violate the Second Amendment.

Moreover, the Second Amended Form 12 (Dkt. 394) is defective and should be dismissed because 1) it was drafted in violation of separation of powers principles, and 2) because the Probation Officer admitted to withholding material facts from the Court, namely the major changes

---

[1] "I mean, certainly based on the evidence that's come in so far, the Government -- I do not believe that the Government has come close to proving its case." Ex. A [2/24 Tr.] 98: 16-18, discussion 94-101.  In response, the Government stated that, while it would not dismiss Charge Five, it would submit on the evidence already presented regarding any of the California Penal Code violations alleged in that Charge. *Id*. at 100-101. Mr. Johnson has relied on that representation, and accordingly, presented no evidence on those violations and presents very limited briefing here.

1   in the complaining witness's testimony.

2       The government also failed to prove Charge Seven largely because the burden is on the

3   government to *disprove* self-defense or defense of another. CALCRIM §§ 875, 3470. Moreover, 1)

4   admission of Dasia Johnson's hearsay statements would violate Mr. Johnson's 14th Amendment

5   right to confrontation under *Comito*; 2) even if her statements are admitted, the Government cannot

6   disprove self-defense or that any force used was likely to cause great bodily injury; and 3) the

7   Government cannot amend the Form 12 to charge a different offense after the close of evidence and

8   any lesser-included would still require the government to disprove self-defense.

9       In light of all the evidence adduced at the hearing, Mr. Johnson respectfully asks that this Court

10  release him to Healthright 360, an inpatient drug program in San Francisco.

11                                    **ARGUMENT**

12      The Court should dismiss the Second Amended Petition because the Government has not met

13  its burden of proof. "It is the government that bears the burden to demonstrate that a defendant has

14  violated a condition of his supervised release." *United States v. Aquino*, 794 F.3d 1033, 1036 (9th

15  Cir. 2015) (internal quotation and citation omitted); *see also* 18 U.S.C. § 3583(e). The government

16  must prove the allegation by a preponderance of the evidence and introduce "*credible* evidence the

17  releasee actually violated the terms of supervised release." *Aquino*, 794 F.3d at 1036 (internal

18  quotation and citation omitted, emphasis added); *accord United States v. Comito*, 177 F.3d 1166,

19  1170 (9th Cir. 1999) (violation finding must be based on "verifiable facts").

20  **I.    Revocation is Not Warranted on Charges One Through Four**

21      The Defense concedes these charges. However, the Government has repeatedly characterized

22  Mr. Johnson as someone who does not want treatment. But evidence at the hearing presented a very

23  different picture of his desire for rehabilitation.  On March 6, 2024, Officer Coppage wrote:

24  "Johnson tested positive today in office for Cocaine, Methamphetamines. Mr. Valentino Johnson is

25  homeless and is struggling severely with drugs." Ex. 104 at G0101. Mr. Johnson entered New Bridge

26  the very next day, but left on March 15, 2024, after trying to take an unknown drug he found in his

27  pocket en route to get suboxone. *Id.* at GO100. Mr. Johnson reported to the Probation office on

28  March 18, said he wanted to do right by his Probation Officer and return to treatment, which he did.

Exhibit A, 2/24/25 TR, 127:5-128:6 [2/24 Tr.]. When he relapsed a second time, Mr. Johnson knew he would not be able to continue drug treatment and absconded. Mr. Johnson continues to want and need inpatient substance abuse treatment, and now has a foundation of sobriety to build upon.

## II.    The Government Has Failed to Prove Charge Five.

The Government has failed to prove Charge Five, forcible rape and related state law violations, by a preponderance of the evidence. The only evidence presented to support this charge was the testimony of A.R., who claimed that Mr. Johnson threatened her with a knife and anally raped her. Dkt. 394 at 4-5. However, A.R.'s testimony is not credible. The evidence introduced at the hearing shows that A.R. suffers from severe bipolar disorder and has a history of auditory and visual hallucinations relating to her sexuality. *See, e.g.*, 2/24 Tr. at 80:25-81:6, 82:13-21; Ex. 207 at 3; Ex. 216; Ex. 217; Ex. 218; Ex. 219; Ex. 123 at 3; Ex. 129 at 3-4; Ex. 133 at 3. Critically, A.R. testified that she was not taking her psychiatric medications consistently in the weeks leading up to the allegation, which can make her symptoms worse. 2/24 Tr. at 75:10-77:23. The evidence also showed that A.R. has made multiple false accusations of sexual assault in the past, including shortly before her accusation against Mr. Johnson. *See, e.g.*, 2/24 Tr. at 65:5-73:5, 83:10-86:3. As this Court correctly recognized, because A.R.'s testimony that Mr. Johnson assaulted her is not credible, the Government did not meet its burden of proof on this count. *See* 2/24 Tr. at 94:10-14 (Court: "unless there is other corroborating evidence coming in, I have a difficult time imagining that I could find by a preponderance of the evidence that the Defendant assaulted the victim"); *United States v. Martin*, 984 F.2d 308, 310 (9th Cir.1993) (a revocation of supervised release must be based on "verified facts").[2]

---

[2] The Government rightly does not argue that it proved any of the other California Penal Code offenses included in Charge Five. *See* Dkt. 394 at 4-5 (charging criminal threat, concealed carry of a dirk or dagger, and spousal battery). These offenses have also not been proven. First, criminal threats was not proven because A.R.'s testimony at trial showed that Mr. Johnson did not orally threaten to stab her, and an oral threat is an element of this offense. *See* CALCRIM § 1300; Tr. 2-24 at 31:2-10 (stating she felt threatened because she knew Mr. Johnson had a knife, not that he made an oral threat). Second, carrying a concealed knife was not proven because the statute does not apply to the red pocketknife that was the only knife introduced into evidence. *See* Cal. Penal Code § 16470. Finally, spousal battery has not been proven because Mr. Johnson did not have the required relationship with A.R. *See* Tr. 2-24 at 26:21-27:1 (A.R. stating she went on a date with Mr. Johnson "A couple times"); Cal. Penal Code § 243(f)(10) (a "[d]ating relationship" is defined as "frequent, intimate associations").

1

### III.    The Government Has Failed to Prove Charge Six.

2          The Government must prove by a preponderance of the evidence that Mr. Johnson possessed a

3   dangerous weapon in violation of Standard Condition #12 that "you must not own, possess, or have

4   access to a firearm, ammunition, or dangerous weapon." *See* Dkt. 394 at 5. The Government failed to

5   do so. Though the Government alleges that Mr. Johnson possessed two knives, one black and one

6   red, only one was introduced into evidence—a red multitool or pocketknife. But a pocketknife is

7   obviously not a dangerous weapon. And without any photos or meaningful description of the alleged

8   black knife, there is no evidence that knife is a dangerous weapon either. Accordingly, Charge Six

9   must be dismissed.

10          **A.    The fact that an object is a knife does not automatically make it a "dangerous**
           **weapon."**

11

12          The Government has charged Mr. Johnson with possessing a dangerous weapon in violation of

13   Standard Condition #12. Dkt. 394 at 4.[3] As Mr. Johnson has already explained, *see* Dkt. 385 at 13-

14   16, the plain language of this provision makes clear that knives are not dangerous weapons within the

15   meaning of this condition. To be sufficiently dangerous as to be proscribed, the weapon in question

16   must have been "***designed, or … modified for, the specific purpose of causing bodily injury or***

17   ***death to another person.***" Dkt. 342 at 4. It goes without saying that many knives are not "designed"

18   or "modified" "for the specific purpose" of causing bodily injury or death. Even large, sharp knives

19   that might be capable of causing great bodily injury or death are not necessarily "designed" or

20   "modified" for that "specific purpose," as Standard Condition #12 requires. Dkt. 342 at 4. Thus, the

21   mere fact that an object is a type of knife, without more, does not suffice to show that it was

22   "designed … for the specific purpose" of causing bodily injury or death.

23          Judge Chen's recent opinion in *Barroca*, which the Government cites (Dkt. 424 at 15),

24   acknowledges this point. *See* Ex. D, *US v. Barroca*, 3:94-CR-00470-EMC, Dkt. 1059 (Order Finding

25   Violation of Condition of Supervised Release) *[Barroca* Order] at 2. *Barroca* involved an older

26   _____

27   [3] In full, the text of the Condition provides, "You must not own, possess, or have access to a firearm,
   ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for,
28   the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers)." Dkt.
   342 at 4.

version of the supervised release condition, which prohibits the possession of "a firearm, destructive device, or any other dangerous weapon." *Id*. at 1. The Sentencing Commission altered this language in 2016, citing concerns that it was vague and overbroad. *See* USSG § 5D1.3(c)(10) (2016); *see also* USSG Amend. 803, Supp. to App. C (Nov. 1, 2024) at 159, 162. The Commission further clarified what constitutes a dangerous weapon by adding the explanatory clause specifying that a dangerous weapon must have been "designed" or "modified" for the specific purpose of causing injury. *Id*. at 159.

As Judge Chen noted, the old, pre-2016 condition is broader because it does not include the key explanatory clause language. *Barroca* Order at 2. Judge Chen recognized that the new condition's narrower language "would exclude most knives or other sharp tools because these instruments, as designed, do not have the 'specific purpose' of [causing] serious bodily injury." *Id*.

The Government resists this straightforward conclusion, claiming that multiple courts have held that knives and other stabbing objects constitute dangerous weapons. Dkt. 424 at 14-15. Not so. To start, many of the cases the Government cites do not even involve a supervised release condition and are therefore totally inapposite.[4] And the remaining cases involve older supervised release conditions that do not include the explanatory clause added to Standard Condition #12 in 2016.[5] Thus, not one of these cases actually considered the question presented here: whether a knife is a dangerous weapon in the absence of evidence that it was "designed" or "modified" for the "specific

---

[4] Three cases addressed the definition of a dangerous weapon in the context of the federal assault statute, not for purposes of interpreting the supervised release condition: *United States v. Matthews*, 106 F.3d 1092, 1095 (2d Cir. 1997); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam); *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc). Another case involved the question of whether a knife is a dangerous weapon under applicable state law, not under the terms of the supervised release condition. *See United States v. Wiley*, 703 F. App'x 950, 951 (11th Cir. 2017) (unpublished) (per curiam) (addressing whether the defendant violated Florida's prohibition on armed trespassing). Finally, *United States v. Lavender*, 224 F.3d 939, 941 (9th Cir. 2000), addressed the definition of a dangerous weapon for the purposes of imposing a sentencing enhancement under USSG § 2B3.1(b)(2)(E) in relation to a robbery, not under the separate definition applicable in the supervised-release context.

[5] *See United States v. Wasielak*, 253 F. App'x 822, 823 (11th Cir. 2007) (unpublished) (per curiam) (condition prohibited defendant from "owning or possessing a firearm, dangerous weapon, or destructive device."); *United States v. Thomas*, No. 06-CR-048-WMC-01, 2011 WL 4356231, at *1 (W.D. Wis. Sept. 16, 2011) ("firearm, destructive device, or other dangerous weapon"); *United States v. Pangelinan*, No. CR. 99-00001, 2007 WL 1175033, at *3 (D. Guam Apr. 23, 2007) (same); *United States v. Tumea*, 810 F.3d 563, 565, 566-67 (8th Cir. Jan. 14, 2016) (special condition prohibited a long list of specifically enumerated dangerous weapons, including certain types of knives).

purpose" of causing bodily injury, as Standard Condition #12 requires.

In the absence of any authority to the contrary, this Court should hold that Standard Condition #12 means what it says: a weapon falls within the residual clause of the condition if it is an object "designed, or … modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers)." Dkt. 342 at 4. Here, the Government has failed to show that either of the knives allegedly in Mr. Johnson's possession fall within this language.

### 1.    There is no evidence that Mr. Johnson's pocketknife was designed to cause bodily injury.

The only knife that was introduced into evidence is a "pocket knife" or "multitool knife." *See* 2/24 Tr. at 103:16-104:9; Trial Exhibit 4. This pocketknife is a small, multi-purpose tool that can serve as a screwdriver, scissors, can opener, bottle opener, and nail cleaner, among other functions. A multitool is plainly not "designed" or "modified" for the "specific purpose" of causing great bodily injury. *See* Dkt. 342 at 4. Indeed, there is no evidence that a pocketknife is even *capable* of causing great bodily injury or death. Accordingly, the pocketknife is not a "dangerous weapon" within the scope of Standard Condition #12.

### 2.    The black knife is not a dangerous weapon.

The black knife Mr. Johnson allegedly possessed did not come into evidence. No photographs of the knife were taken when it was confiscated, and no witness identified it at the hearing. The knife is not visible on any bodycam footage because Officer Prasadi did not have his bodycam on when he seized the knife, in violation of SFPD Bodyworn Camera Policy. *See* 2/24 Tr. at 112:21-114:13. The Government has not proven that Mr. Johnson possessed this particular knife.[6]

And even assuming Mr. Johnson possessed this knife, the Government did not introduce any evidence that this knife was "designed" or "modified" for the "specific purpose" of causing great

---

[6] The Form 12 stated that "[o]n October 6, 2024, at approximately 0045 hours, during a search of Mr. Johnson's person and property, officers found *a black 'dagger' knife* in his shorts." Dkt. 394 at 5 (emphasis added). Generally, when the government asserts in the indictment that a defendant possessed a particular weapon, it must prove possession of that weapon to obtain a conviction. *See United States v. Leichtnam*, 948 F.2d 370, 379 (7th Cir. 1991). Although there is no indictment in supervised-release proceedings, similar notice principles apply. *See* Fed. R. Crim. P. 32.1(b)(2). The government's failure to prove that Mr. Johnson possessed a particular "black knife" whose possession violates his conditions of supervised release is an additional reason to find in his favor.

bodily injury. *See* Dkt. 342 at 4. The only testimony regarding what the knife looks like came from Officer Prasadi, who claims to have retrieved the knife from Mr. Johnson's pocket in the holding cell at Tenderloin Station. 2/24 Tr. at 111:17-25. In his testimony, Officer Prasadi described the knife as a "fixed blade knife," not a dagger style knife. *Id*. at 112:1-6. Officer Prasadi did not recall anything else about the knife and stated that he would not be able to identify knife if he saw it. *Id*. Officer Prasadi was not able to recall how the knife compared to an ordinary kitchen knife. *Id*. at 115:5-17. When asked what about the knife was dangerous, Officer Prasadi simply stated, "It's a knife." *Id*. at 114:21-23. In the absence of evidence that the knife was "designed" or "modified" for the "specific purpose" of causing great bodily injury, possession of the knife does not violate Standard Condition #12. *See* Dkt. 342 at 4; *see also Barroca* Order at 2.

### 3. The black knife did not become a dangerous weapon based on how it was used.

The Government also urges that the black knife (which is not in evidence) was dangerous because of how Mr. Johnson used it. Dkt. 424 at 15. There are two problems with this argument.

First, this argument is inconsistent with the text of Standard Condition #12. The Condition lists only two ways an object becomes a dangerous weapon: it must be either designed or modified for that purpose. Dkt. 394 at 5. In terms of objects that are "designed" to cause injury, "nunchakus" and "tasers" are listed as examples. *Id*. Those objects clearly do not become dangerous based on use— they are dangerous from the moment they were designed, regardless of how they are used. The Condition also specifies that an object could become a dangerous weapon if it is "modified" to become the type of object that can cause bodily injury. *Id*. But again, the Condition would bar possession of that object from the moment it is so modified, regardless of the manner in which the object is used. Nothing about this language suggests that an object can become a dangerous weapon based on how it is used.[7]

Again, the caselaw cited by the Government is not to the contrary. *See* Dkt. 424 at 13-14. Those cases involve different definitions of the term "dangerous weapon" that do not include the key

---

[7] Moreover, the omission of any reference to how objects are used in the condition was intentional. Other definitions of the term "dangerous weapon," expressly reference use. *See* USSG §1B1.1, cmt., n.1(E) (2024); 18 U.S.C. § 111(b).

explanatory parenthetical further defining the term.[8] Thus, they did not consider whether the text of Standard Condition #12, which references only the design and modification of weapons, also includes the manner in which a weapon is used.

Second, even assuming a knife can become a dangerous weapon based on how it is used, there is no evidence that is what occurred here. In the cases cited by the Government, the defendants actually used the knife to cause injury, or they pulled out and brandished the knife in a threatening manner. *See, e.g.*, *Alston*, 295 F. App'x at 476 (defendant stabbed one victim and cut another); *Matthews*, 106 F.3d at 1094 (victim was threatened with knife held to his head); *Griffin*, 294 F. App'x at 394 (defendant pulled out knife and ordered officials out of his house); *see also Guilbert*, 692 F.2d at 1342 (broken beer bottle and broken pool stick were dangerous weapons where they were used to stab and strike victim).[9] But Mr. Johnson did no such thing.

A.R. did not testify that Mr. Johnson pulled out a knife and threatened her. She said that she knew Mr. Johnson had a knife because he asked her to pack up his things, and she saw the knife when she packed it. 2/24 Tr. at 30:22-31:10. Critically, A.R. said that Mr. Johnson did not even threaten her with the knife: "I don't know if he said: I have a knife, I'm going to use it. *I don't think that's what he said*." *Id*. at 31:3-6 (emphasis added). She said: "I knew from the previous interaction that he had a knife, so I was concerned about it." *Id*. at 31:7-10. That is not enough to show Mr. Johnson used the knife to threaten A.R.—on this account, Mr. Johnson did not *use* the knife at all.

The Government has also attempted to add two new factual allegations not included in the Form 12, claiming that the knife was used to threaten during a drug deal and was used to threaten Officer Carvajal. As explained below, *see infra* at V.C., these claims cannot be added after the

---

[8] *Matthews*, 106 F.3d at 1095 (addressed the definition of a dangerous weapon in the context of the federal assault statute, not the for purposes of interpreting the supervised release condition); *Guilbert*, 692 F.2d at 1343 (same); *United States v. Speed*, 811 F.3d 854, 860-61 (7th Cir. Jan. 19, 2016) (involved older, pre-2016 supervised release condition). Two of the cited cases do not specify the text of the applicable condition, but both are pre-2016 cases that involved different issues. *See United States v. Griffin*, 294 F. App'x 393, 394 (10th Cir. 2008) (unpublished) (addressed whether the district court's "reliance on hearsay statements violated due process," not the definition of a dangerous weapon); *United States v. Alston*, 295 F. App'x 474, 477 (2d Cir. 2008) (determined that a knife was a dangerous weapon based partly on New York law not applicable here).

[9] *Speed* involved a facial challenge to a "dangerous weapons" condition and is therefore not relevant to show what actual use requires. *See* 811 F.3d at 861.

hearing. And in any event, the claims fail on the merits. While A.R. mentioned that she saw Mr. Johnson threaten someone with a knife during a drug deal, she did not initially report this to the police, could not recall on what date this happened, and could not provide much in the way of specifics. 2/24 Tr. at 30:10-21. Given the significant problems with A.R.'s credibility, this is not enough to prove that Mr. Johnson actually used a knife to threaten anyone.

The Government also claims that Mr. Johnson threatened to stab Officer Carvajal during transport. Dkt. 424 at 15. Officer Carvajal did not claim that Mr. Johnson actually brandished the knife when making these threats, so his testimony does not show that Mr. Johnson ever *used* the knife in a dangerous manner. Moreover, Officer Carvajal admitted that he did not actually remember Mr. Johnson threatening to stab him—he just reviewed his bodyworn camera footage and heard that he said Mr. Johnson threatened to stab him on the footage. Exhibit B, 3/10/25 Tr. at 12:7-10 [3/10 Tr.]. Importantly, the threat itself was not captured in the footage, which shows Mr. Johnson was unable to even hold his head up, let alone stab anyone. And the police report does not mention Mr. Johnson being aggressive in any manner. *Id*. at 12:15-19, 21:5-7. The only evidence regarding aggressiveness was Officer Carvajal's unsworn, unproven statement to another officer, which was captured on bodyworn camera. Thus, the Government has not met its burden to show that Mr. Johnson actually used the black knife as a dangerous weapon.

#### 4.    The black knife did not become a dangerous weapon based on where it was found.

Finally, the Government argues that the black knife became a dangerous weapon because of the context in which it was found. Dkt. 424 at 15. The Government points to Officer Prasadi's testimony that the knife was dangerous not because of any quality inherent to the knife, but rather because of "the context in which it was found"—namely, because Mr. Johnson was currently in the holding cell at Tenderloin Station. 2/24 Tr. at 114:17. There are two problems with this argument.

First, nothing in the text of Standard Condition #12 suggests that an item that does not fall within the definition of "dangerous weapon" can become a "dangerous weapon" based on where it is located. Nor can the Government point to a case so holding. Dkt. 424 at 15 (citing *United States v. Enos*, 453 F.2d 342, 343 (9th Cir. 1972) (knife used to stab victim); *Guilbert*, 692 F.2d at 1342

(broken beer bottle and broken pool stick used to stab and strike victim)). Second, it is undisputed that Mr. Johnson was arrested and taken to the holding cell *against his will*, and after officers were instructed not to arrest him at all. Ex. 104 at 7, G0262, 11/18/2024 PO Case Note. It would be the height of unfairness to punish Mr. Johnson for possession of a knife that only became dangerous because of actions taken by the police, rather than Mr. Johnson.

### B.    Finding that Mr. Johnson's possession of these two knives violated Standard Condition #12 would violate the U.S. Constitution.

Finally, finding that Mr. Johnson violated the supervision condition prohibiting possession of a dangerous weapon in these circumstances would violate the U.S. Constitution in two ways.

### 1.    The condition is vague as applied to these knives.

First, the condition is vague and overbroad as applied to the two knives that Mr. Johnson is alleged to have possessed. "A probationer must be put on clear notice of what conduct will (and will not) constitute a supervised release violation." *United States v. Evans*, 883 F.3d 1154, 1164 (9th Cir. 2018) (internal quotation marks omitted)). "A supervised release condition "violates due process of law if it … forbids … the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Soltero*, 510 F.3d 858, 866 (9th Cir. 2007) (per curiam) (citations and quotation marks omitted). Here, a reasonable person reading Standard Condition #12, which prohibits him from owning weapons "designed" or "modified" for the "specific purpose" of causing bodily injury (and which lists "nunchakus" and "tasers" as examples of forbidden weapons), would not understand that the condition also barred him from possessing a kitchen knife and a pocketknife.

The cases cited by the Government are not to the contrary. First, the Government cites three unpublished cases holding that the dangerous weapons condition is not *facially* vague.[10] But to prevail on a facial challenge to a supervised release condition "requires a defendant to establish that *no set of circumstances exists* under which the [condition] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). Caselaw rejecting facial challenges to the dangerous weapons conditions

---

[10] *See* Dkt. 424 at 14-15 (citing *United States v. Angle*, 761 F. App'x 775, 778 (9th Cir. 2019); *United States v. Kay*, 722 F. App'x 750, 751 (9th Cir. 2018); *United States v. Welsh*, 730 F. App'x 494, 495 (9th Cir. 2018).

1  says nothing about the question here: Whether the language of the condition was sufficient to give

2  Mr. Johnson notice that he could not possess the two specific knives at issue.[11] For the reasons

3  explained above, it did not.

4      This is also a reason to reject the Government's unsupported "use" and "context" arguments: a

5  reasonable person reading Standard Condition #12 would not understand it to say that he could

6  possess a knife only if he used it in a certain manner, or that he could possess a knife but couldn't

7  take it certain places. The condition simply does not say any of that. Interpreting the condition in the

8  manner the Government urges would thus create vagueness and notice problems and render it

9  unconstitutional as applied to Mr. Johnson's conduct.

10      **2.    The Government's interpretation violates the Second Amendment.**

11      Further, the Court should decline to interpret the special condition as broadly prohibiting Mr.

12  Johnson from possessing any knife, which would violate the Second Amendment's guarantee of the

13  individual right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The

14  protections of the Second Amendment apply "to all instruments that constitute bearable arms,"

15  including knives. *Id.* at 582; *Fouts v. Bonta*, 718 F. Supp. 3d 1276, 1279 (S.D. Cal. 2024). Thus, Mr.

16  Johnson has a right "to possess and carry" a knife "in case of confrontation.'" *New York State Rifle &*

17  *Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 32 (2022). Because the Second Amendment presumptively

18  guarantees Mr. Johnson a right to bear arms in public for self-defense, the government bears the

19  burden of demonstrating that Special Condition #12's restriction on the possession of *any* knife for

20  the purposes of self-defense "is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at

21  33, 17. It isn't. A historical analysis shows that the right to possess a knife for self-defense is

22  *consistent* with U.S. tradition.[12] *See, e.g., State v. DeCiccio*, 315 Conn. 79, 120 (2014); *State v.*

23  _____

24  [11] The Government's three cited out-of-circuit authorities are doubly unpersuasive: these cases involve facial
   challenges to a different condition than the one at issue here. *See* Dkt. 424 at 13-14 (citing *United States v.*

25  *Garcia-Mejia*, 394 F.3d 396, 397-98 (5th Cir. 2004), *cert. granted, judgment vacated*, 545 U.S. 1102 (2005);
   *United States v. Armour*, 804 F.3d 859, 868-69 (7th Cir. 2015); *Speed*, 811 F.3d 854, 861).

26  [12] It is true that the Supreme Court has held that historical "tradition of firearm regulation allows the
   Government to disarm individuals who present a credible threat to the physical safety of others." *Rahimi*, 602

27  U.S. at 700. However, *Rahimi* is distinguishable. Though the federal statute at issue in *Rahimi* prohibited the
   defendant from possessing a firearm for self-defense, its terms did not prohibit the possession of other arms,

28  such as a knife, for self-defense. *Id.* at 688. By contrast, if Standard Condition #12 is interpreted to bar
   firearms and knives, as well as tasers and other non-lethal "dangerous" weapons, it would essentially bar Mr.

*Delgado*, 298 Or. 395, 401 (1984). At minimum, the constitutional-avoidance canon counsels against applying this condition in these circumstances. *See Prison Legal News v. Ryan*, 39 F.4th 1121, 1131 (9th Cir. 2022).

## IV.    The Second Amended Form 12 is Defective and Should Be Dismissed.

The Second Amended Form 12 is defective and should be dismissed. As discussed *infra*, Officer Coppage's testimony during the revocation hearing revealed that both the Government and U.S. Probation were aware that the complaining witness in Charge Seven had recanted significant portions of her initial allegations against Mr. Johnson—information that was not presented to the Court in the Form 12.

### A.    Relevant factual background

Charge Seven relates to conduct that allegedly took place in January 2024. It was not included in the initial Form 12, filed in April 2024, or in the First Amended Form 12, filed in October 2024. *See* Dkt. 363. In fact, the Form 12 was not amended to include Charge Seven until February 14, 2025, only ten days before the scheduled revocation hearing. *See* Dkt. 394; *see also* 3/10 Tr. at 71.

At the revocation hearing, it became apparent that Officer Coppage omitted material, exculpatory facts from the Second Amended Form 12. He knew that the complaining witness, Dasia Johnson, had significantly changed her story regarding the alleged assault, and had essentially admitted she had lied to the police in her initial report. Specifically, in an interview of Dasia conducted by FBI SA Chaneski and Officer Coppage on January 30, 2025, two weeks before the Second Amended Form 12 was filed, Dasia explicitly recanted or omitted vital portions of her initial account to police: that Mr. Johnson drew a gun on her and struck her with it multiple times, that Mr. Johnson dragged her out of the vehicle, and that Mr. Johnson threw her to the ground so violently she lost consciousness and then kicked her. Instead, she admitted that Mr. Johnson did not have a gun during the alleged assault, and did not repeat any claims that Mr. Johnson had physically attacked her at all. *Compare* Dkt. 394 at 5 *with* Ex. 257 *and with* Exhibit C, 3/11 Tr. at 176:12-24; 183:23-186:16 [3/11 Tr.]. Officer Coppage included the initial allegations in the Second Amended Form 12 without

---

Johnson from possessing any item that he could conceivably use for self-defense—an issue the Supreme Court did not confront in *Rahimi*.

1  mention of Dasia's later recanting and inconsistent statements.

2          The Second Amended Form 12 also omitted the fact that immediately after the incident, in

3  January 2024, Mr. Johnson told Officer Coppage that Dasia stabbed him, and he acted in self-

4  defense. *Compare* Dkt. 394 at 5-6 with 3/10 Tr. at 85:7-23. Nevertheless, Officer Coppage cited the

5  police report, "witness statement and video" as his sources of information. Dkt. 394 at 5-6.

6          Upon questioning by the Court, Officer Coppage testified that he filed the Second Amended

7  Form 12 because the prosecution asked him to. 3/10 Tr. at 111:9-14 ("I drafted the charge, but it was

8  based off of the AUSA asking that we move -- add the additional charge"); *id*. at 114:5-8. He

9  claimed he did not include information about Dasia's recantation in the Form 12 because it is not his

10 responsibility to determine what is true or false, so he just wrote the description based on the police

11 report. *Id*. at 111:15-112:5; 112:8-12 ("I include the story that I'm given from the law enforcement

12 perspective."). Officer Coppage testified that he wrote the factual description in Charge Seven but

13 did so based on the prosecution's request. 3/10 Tr. at 111:9-14. Officer Coppage testified he alleged

14 probable cause to find a violation of Cal. Penal Code § 245 because that was what the AUSA

15 believed she could prove. *Id*. at 113:14-23 ("based on the AUSA desiring to take steps in order to file

16 those charges, that's who would I guess ultimately be the one to decipher whether there is enough to

17 go on.")

18         Additionally, Officer Coppage revealed that he assisted the prosecution in a variety of ways.

19 Officer Coppage assisted the FBI with serving a subpoena on Dasia. 3/10 Tr. at 79-80, 83-84. He

20 also acted as a "case agent" on behalf of the Government by interviewing witnesses and writing

21 reports relating to Charge Five, specifically A.R. and Deirdre O'Neill. *Id*. at 84-85; 115:17-116:2;

22 3/11 Tr. at 181:3-4. After an FBI agent was assigned to this case, they "took over that role." 3/10 Tr.

23 at 84-85. This is why Dasia's interview was memorialized only by the FBI. *Id*. at 85. Officer

24 Coppage did not take his own independent notes of Dasia's interview, he just incorporated the FBI

25 report by reference.[13] Exs. 256, 257; 3/10- Tr. at 80-81, 83; 3/11 Tr. at 181:14-22.

26

27 ─────────────────────
[13] Officer Coppage did not take independent notes of the interview, and incorporated the FBI report by
28 reference. But he testified that the way the FBI report was worded did not always correspond to his memory of
   what Dasia said or meant. *See, e.g*., Tr. 3-10 at 98:7-99:5. Certain topics that Officer Coppage recalled having
   discussed were not reflected in the FBI Agent's notes. *See, e.g., id*. at 102:4-23. By failing to take independent

1

### B.  Contrary to the Government's argument, it is improper for Probation to bring charges based on AUSA's arguments.

Officer Coppage's testimony reveals extensive and serious improprieties in the handling of this case. As this Court knows, a probation officer has a statutory duty to **"**immediately report any violation of the conditions of [supervised] release to the court and the Attorney General." 18 U.S.C. § 3603(8)(B). "The federal probation officer serves as the court's eyes and ears . . . The judge must rely on the frank, unfiltered reports of the probation officer in order to monitor the offender's compliance with the court's own orders." *See United States v. Berger*, 976 F. Supp. 947, 949 (N.D. Cal. 1997) (cleaned up, citation omitted).

In initiating revocation proceedings, a probation officer "acts as an agent of the court, **not as a law enforcement agent**." *Berger*, 976 F. Supp. at 949 (emphasis added). In contrast to a prosecutor, who commences a criminal prosecution by filing an indictment, "[t]he probation officer's petition does not itself initiate revocation proceedings; instead, it is the district court that ultimately decides whether to initiate revocation proceedings after considering the probation officer's report and petition." *United States v. Mejia-Sanchez*, 172 F.3d 1172, 1175 (9th Cir. 1999). Allowing the AUSA to tell Probation what to write in a Form 12, or to suggest that Probation emphasize certain facts over others, raises the risk that probation officers, members of the judicial branch, will function as unappointed prosecutors. Probation performing the executive function of prosecution raises serious separation of powers concerns. *Id.* at 1174.[14] Probation's responsibility is simply to provide the court with "frank, unfiltered reports" so that the Court can evaluate the evidence for itself. *Berger*, 976 F. Supp. at 949. The Government protests that Probation frequently consults with the U.S. Attorney's Office in determining whether there is sufficient evidence to support a Form 12 revocation petition. Dkt. 424 at 20. Frequency does not solve a constitutional problem, however. The U.S. Attorney's Office cannot dictate what information Probation provides to the Court. Officer Coppage's testimony

notes on Dasia's interview, Officer Coppage essentially accepted the law enforcement interpretation of what she said rather than documenting his own conclusions for the Court.

[14] As the Government acknowledges, if a prosecutor concludes that a violation of supervised release has occurred, the prosecutor has the authority to file her own motion to revoke supervised release (and initiate criminal proceedings as needed). *See* Dkt. 424 at 20; *Mejia-Sanchez*, 172 F.3d at 1175; *Berger*, 976 F. Supp. at 949. Given this authority, there is no practical need for the U.S. Attorney's Office to tell Probation what charges it should or should not bring.

1 | that he added Charge Seven because the AUSA asked him to and wrote the factual description in

2 | Charge Seven based on "the law enforcement perspective" is evidence he improperly delegated the

3 | court's supervisory power to the U.S. Attorney. Tr. 3-10 at 111:9-14 ("I drafted the charge, but it was

4 | based off of the AUSA asking that we move -- add the additional charge"), 112:8-12, 114:5-8. Courts

5 | have recognized that leaving the decision to initiate supervised release proceedings to the prosecution

6 | is effectively "relegating th[e court's] supervisory power to the United States Attorney," which

7 | "'would be tantamount to abdicating the Judiciary's sentencing responsibility to the Executive.'"

8 | *Mejia-Sanchez*, 172 F.3d at 1175 (quoting *Berger*, 976 F. Supp at 950). By bringing Charge Seven

9 | purely because the prosecution asked him to, that is precisely what Officer Coppage did here.

10 | Additionally, Officer Coppage's testimony that he assisted the prosecution in a variety of ways

11 | raises concerns that he acted as an agent of the Executive rather than the Judicial branch in carrying

12 | out his duties in this case. Officer Coppage testified that he acted as a "case agent" on behalf of the

13 | Government—a duty typically fulfilled by an FBI Agent—by interviewing the complaining witness

14 | relating to Charge Five. *See supra* at IV.A. Officer Coppage also assisted the FBI with serving a

15 | subpoena on Dasia, even though that is not part of his responsibility as a probation officer. *Id*. But as

16 | a Judicial officer, it is improper for Officer Coppage to fulfill duties that are generally fulfilled by

17 | law enforcement agents who are members of the Executive branch.

18 | The three out-of-circuit district court decisions cited by the Government are not to the contrary.

19 | *See* Dkt. 424 at 20. First, the probation officer in *Ferrara* consulted the U.S. Attorney's Office, but

20 | independently determined that the possible violation did not merit the filing of a petition for

21 | revocation of supervised release. 2008 WL 2222033, at *1. The U.S. Attorney's Office disagreed and

22 | filed its own petition for revocation. *Id*. Thus, there was no separation of powers issue.

23 | Second, *Schiff* noted that Probation officers function independently during revocation hearings,

24 | with AUSAs participating only when "the probation officer raises a question of special relevance to

25 | the government or the probation officer himself must testify" and cannot manage the presentation of

26 | evidence. *Schiff v. Dorsey*, 877 F. Supp. 73, 79 (D. Conn. 1994). *Schiff* did not suggest that the U.S.

27 | Attorney's Office could tell Probation what charges to bring and what charges not to bring.

28 | Finally, as for *Carrillo-Carion*, that case involved a completely different issue. The

defendant's plea agreement provided that the United States would not bring any additional charges against the defendant arising out of his conduct known to the United States Attorney at that time. *United States v. Carrillo-Carion*, 373 F. Supp. 2d 1225, 1225–26 (D.N.M. 2004). The Court held that Probation's bringing of a revocation petition did not violate the plea agreement, even though there was evidence that Probation probably would not bring the Petition for Revocation of Supervision if the AUSA did not think it should. *Id.* at 1227. The Court did not have occasion to consider whether it was improper for the AUSA to dictate Probation's behavior in this manner, as the issue does not appear to have been raised. *Id.*

In sum, probation officers do not work for the U.S. Attorney's Office—their function is to serve as "neutral information gatherer with loyalties to no one but the court." Sharon M. Bunzel, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 Yale L.J. 933, 945 (1995). Officer Coppage violated this important duty. In failing to note the inconsistencies and recantations he was aware of when he filed the Second Amended Form 12, Officer Coppage did not properly discharge his duty of candor to the Court. *See Berger*, 976 F. Supp. at 949 (the judge relies on the "frank, unfiltered reports of the probation officer in order to monitor" compliance with its order) (cleaned up, citation omitted).

### C.    The proper remedy is dismissal of the Form 12.

In light of these significant improprieties, this Court should order the Form 12—or at the very least Charge Seven—dismissed, pursuant to its inherent supervisory powers.

Federal courts have inherent supervisory powers that allow them to "exercise substantial discretion over what happens inside the courtroom." *United States v. W.R. Grace*, 526 F.3d 499, 509 (9th Cir. 2008) (internal quotation marks omitted); *Aloe Vera of Am., Inc. v. United States*, 376 F.3d 960, 964–65 (9th Cir. 2004) (per curiam). These powers can be used to create "remed[ies] designed to deter illegal conduct." *See United States v. Hasting*, 461 U.S. 499, 505 (1983). For instance, an indictment can be dismissed due to government misconduct in the prosecution of the case. *United States v. Ramirez*, 710 F.2d 535 at 541 (9th Cir. 1983); *United States v. Owen*, 580 F.2d 365, 367

16

(9th Cir. 1978).[15]

It follows that a Form 12 can be dismissed if there are significant improprieties in how U.S. Probation and the AUSA have handled the case. Here, dismissal is needed "as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature." *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978). Officer Coppage's testimony made clear U.S. Probation regularly leaves the determination of whether to allege a violation in a Form 12 to the AUSA. For instance, Officer Coppage stated:

> Our purpose and intent is to show there is a charge and based on the AUSA desiring to take steps in order to file those charges, that's who would I guess ultimately be the one to decipher whether there is enough to go on based off of her knowing that these other statements are here because, I mean, honestly that's kind of her role; right. She deciphers, okay, here is a charge.

3/10 Tr. at 113:13-24.

The actions undertaken here were prejudicial to Mr. Johnson. At the AUSA's request, Probation added Charge Seven at the eleventh hour, only ten calendar days and five business days before the revocation hearing was set to commence. This gave Mr. Johnson's legal team extremely limited time to investigate the charge and prepare to litigate it. And because Mr. Johnson was in custody, a continuance was not viable.

In the alternative, the Court should strike Officer Coppage's testimony as to Charge Seven. *Cf. U.S. v. Montgomery*, 998 F.2d 1468, 1479 (9th Cir. 1993) (a district court may strike witness testimony pursuant to its broad power to control the conduct of trial). As explained above, Officer Coppage failed to uphold his duty of candor to the Court. And not only that, Officer Coppage also exhibited significant bias in favor of the Government in the manner that he testified. Officer Coppage repeatedly testified that he was too busy to properly supervise Mr. Johnson. He testified that he was too busy to take proper notes on important matters relating to Mr. Johnson's behavior during supervision. 3/10 Tr. at 76:7-77:11, 80:5-18, 86:18-23, 89:19-90:12; *see also* Ex. 256 (case notes).

---

[15] The standard for dismissing an indictment is a high one—there must be a "clear basis in law and fact" for finding "flagrant and outrageous misconduct." United States v. Mitchell, 572 F. Supp. 709, 713 (N.D. Cal. 1983). An indictment will proceed to trial only after it is returned by a legally constituted grand jury. *United States v. Conn*, 577 F. Appx. 724 (9th Cir. 2014) ("An indictment returned by a legally constituted grand jury that is valid on its face is sufficient to proceed to trial, even if based on incompetent evidence. "). Thus, dismissing an indictment ---. Because a Form 12 petition is a significantly less formal document that does not require as much time and resources to file, dismissing it is a less harsh sanction.

17

For instance, Officer Coppage interviewed April McCann, a witness to the January 20, 2024 incident, only six days after it occurred—but he failed to take any notes on their conversation. 3/10 Tr. at 87:10-25. Moreover, his pro-prosecution bias likely infected his memory of that interview. Although he failed to document whether he saw visible injuries on Ms. McCann during that meeting, at the hearing—over a year later—he spontaneously recalled that she had *no* visible injuries, and only admitted his memory might not be accurate when cross-examined with Ms. McCann's medical records, which clearly showed that she did have a visible injury at the time Officer Coppage claims he interviewed her. Tr. 3-10, 92-93; Tr 3-11 at 189:8-10. Similarly, he spontaneously recalled that two days after the incident, Mr. Johnson "actually came to my office on this day that he gave the statement, and he just kind of raised his sleeve up as though -- you know, to show me an injury that he sustained from the daughter. I, of course, didn't see any injury; but he just kind of lifted up swiftly. And so, that was on the 22nd of January." 3/10 Tr. at 66:20-67:2. But this testimony was in direct conflict with his notes of the encounter, which made no mention that he saw Mr. Johnson in person, made no mention that he saw no visible injury, and instead say "USPO is going by client's house today to verify wounds and story" which he would not have needed to do if he had already interviewed Mr. Johnson in person and seen that he had no wounds. Ex. 256. Officer Coppage's strong desire to "assist" the government and FBI was clear.

Officer Coppage further testified that he requested the police report regarding the January 20, 2024 incident, but when the report didn't arrive, he was too busy to follow up. 3/11 Tr. at 179:6-11. He did not obtain a copy of the police report until January 28, 2025, and then only because the AUSA provided it to him. *Id*. Yet, Officer Coppage apparently had time to assist the Government by writing formal witness reports and assisting in the service of subpoenas. 3/10 Tr. at 84:12-6; 3/11 Tr. at 180:12-181:4. Officer Coppage's testimony as to Charge Seven should be stricken.

### D. The Form 12 is based on knowing and reckless omissions of material fact.

In addition, the Second Amended Form 12 is invalid because it is based on a knowing and reckless omission of material facts by U.S. Probation.

The Fourth Amendment requires that "every warrant … be based upon probable cause, supported by oath or affirmation." *United States v. Vargas-Amaya*, 389 F.3d 901, 904 (9th Cir.

2004). Critically, this requires that the affiant actually believe the facts he is swearing to are true. As the Supreme Court has explained:

> [W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing" …. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, …. But surely it is to be "truthful" in the sense that **the information put forth is believed or appropriately accepted by the affiant as true**.

*Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). Thus, a "warrant based upon knowing or recklessly made falsehoods in the affidavit will be invalid." *Mills v. Graves*, 930 F.2d 729, 733 (9th Cir. 1991); *Franks*, 438 U.S. at 164–65.

*Franks* held that a defendant could challenge a facially valid search warrant by making a substantial preliminary showing that the underlying affidavit (1) "contains intentionally or recklessly false statements," and (2) "the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir. 1980). Where the defendant makes such a showing, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks*, 438 U.S. at 155–56. "If the court concludes that the magistrate or judge in issuing the warrant was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, then suppression is an appropriate remedy." *United States v. Stanert*, 762 F.2d 775, 780 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985).

Though *Franks* itself involved a search warrant, its holding has been extended to other situations where a sworn statement is required to show probable cause, such as arrest warrants.[16] And, as relevant here, the Ninth Circuit has suggested that a petition to revoke supervised release similarly requires sworn allegations showing probable cause. *See Vargas-Amaya*, 389 F.3d at 904.[17]

---

[16] *See, e.g., Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019) (applying *Franks* to arrest warrant); *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996); *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994).

[17] While *Vargas-Amaya* dealt with 18 U.S.C. § 3583(i), the Court reasoned that § 3606 should be interpreted consistently. *See* 389 F.3d at 905 n.2; *see also Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 876 (9th Cir. 2007) (so interpreting *Vargas-Amaya*).

1    Accordingly, a Form 12 is invalid under *Franks* if a Probation officer swears to facts that they know

2    are not true in support of a probable cause determination.

3        Importantly, *Franks* bars not only affirmative misrepresentations of fact, but also "deliberate or

4    reckless omissions of facts that tend to mislead." *Stanert*, 762 F.2d at 781. This is because "a warrant

5    affidavit must … allow the magistrate to make an independent evaluation of the matter." *Franks*, 438

6    U.S. at 165, a requirement that is not met when material facts are omitted. "By reporting less than the

7    total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to

8    be misled in such a manner could denude the probable cause requirement of all real meaning."

9    *Stanert*, 762 F.2d at 781. That is precisely what happened here.

10                    **1.    Officer Coppage violated *Franks*.**

11        In the Second Amended Form 12, Officer Coppage presented Dasia's initial description of

12    events as written in the police report, without acknowledging the fact that Dasia had recanted that

13    description of events in her interview. *See* Dkt. 394 at 5-6. Officer Coppage stated that this charge

14    was evidenced by the police report and by Dasia's "witness statement," without mentioning that the

15    witness statement had since been recanted. *Id*. at 6. Whether or not Officer Coppage acted in bad

16    faith is irrelevant: "There is no "good faith" exception to the *Franks* doctrine." *Mills v. Graves*, 930

17    F.2d 729, 733 (9th Cir. 1991). Here, Officer Coppage knew or should have known that, by omitting

18    the facts that he had learned during his interview with Dasia, he made the altercation in the car sound

19    much more serious than it actually was. *See, e.g.*, 3/10 Tr. at 99:16-25 (Officer Coppage stating that

20    whether or not Mr. Johnson had a gun was "very important"). And by omitting the fact that Dasia

21    significantly changed her story, Officer Coppage presented her as a credible source without

22    acknowledging that there were serious reasons to doubt the truthfulness of her allegations. These are

23    precisely the kinds of "deliberate or reckless omissions of facts that tend to mislead" in violation of

24    *Franks*. *See Stanert,* 762 F.2d at 781.

25        A *Franks* hearing is not necessary here, as the information required to show that Officer

26    Coppage omitted material facts was already adduced during the revocation hearing. Thus, the only

27    remaining question for this Court is whether there would have been probable cause on Charge Seven

28    without these material omissions. *See Lefkowitz*, 618 F.2d at 1317 (9th Cir.). The answer is no.

### 2. When all the information is considered, there is no probable cause to believe Mr. Johnson committed Charge Seven.

A finding of probable cause must be based on "*reasonably trustworthy information* sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924-25 (9th Cir. 2001) (quotation omitted) (emphasis added). In establishing probable cause, "officers may not solely rely on the claim of a citizen witness that [s]he was a victim of a crime." *Id*. at 925. The determination whether there was probable cause is based upon the information the officer had at the time of making the arrest, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)—or, in this case, at the time of writing the Second Amended Form 12.

Here, the only evidence that Mr. Johnson had committed an assault with force likely to cause great bodily injury was Dasia's statement claiming that he threatened her with a gun, struck her with it repeatedly, and threw her to the ground so hard she lost consciousness.[18] But that statement alone was not sufficient to give rise to probable cause because Dasia's changing story and her admission that she lied to the police because she was angry at her father show that her account of events is not "reasonably trustworthy." *Cf. Lefkowitz,* 618 F.2d at 1317 & n. 4 (no *Franks* violation where officer omitted informant's possible motives "of spite, vengeance, and perhaps a desire to obtain advantageous property settlement information via an IRS investigation" because information was corroborated by IRS files showing that tax offenses had been committed); *John v. City of El Monte*, 505 F.3d 907 (9th Cir. 2007), *as amended and superseded on denial of reh'g*, 515 F.3d 936, 940-41 (9th Cir. 2008) (probable cause where complaining witness's statement was corroborated by her notes and officer "tested" the witness's veracity and found that she recalled events with "consistency and accuracy without any detection of exaggeration, fabrication, or deception"); *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir.1997) (probable cause where two confidential informants gave independent statements that were detailed and that corroborated each other, and one informant made the statement against his penal interests).

---

[18] The Second Amended Form 12 also claims to be founded on "video footage," but there is no evidence regarding whether this refers to the bodyworn camera footage of Dasia's initial statement to the police or the bystander video footage.

1    Moreover, even if Dasia's revised account of events were credible, it would not be sufficient

2    for a finding of probable cause. All Dasia said was that she and Mr. Johnson "tussled." DE257 at 2.

3    That does not come close to establishing probable cause that Mr. Johnson committed an assault *with*

4    *force likely to cause great bodily injury*, which is the offense charged in the Form 12.

### 3.    The proper remedy is to dismiss Charge Seven.

6    Because *Franks* involved material omissions in the context of a search warrant, the proper

7    remedy there was suppression of the evidence obtained using that search warrant. *See Stanert*, 762

8    F.2d at 780. Here, because material omissions resulted in Charge Seven being brought without

9    probable cause, the proper remedy is to dismiss Charge Seven. The requirement that a warrant issue

10    based on sworn facts showing probable cause "would be reduced to a nullity if a[n] … officer was

11    able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the

12    magistrate, then was able to remain confident that the ploy was worthwhile." *Franks v. Delaware*,

13    438 U.S. at 168.

14    Dismissal is particularly appropriate here because Officer Coppage's testimony repeatedly

15    suggested that he conducted this case in the manner that he did because he was acting in

16    conformance with U.S. Probation's usual practice, which appears to be in tension with *Franks*'

17    requirements. *See, e.g.*, 3/10 Tr. at 109:14-17 ("We don't necessarily -- as probation officers, we

18    don't necessarily dissect the case."); 110:14-16 ("for Probation, Your Honor, we don't necessarily try

19    to solve these matters ourselves."); 111:20-112:1 ("what we use as evidence is the arrest report, Your

20    Honor. We don't necessarily …. decipher the truth from the falsities; …. going off of the law

21    enforcement's work, … that's what we validate our charges on."). Officer Coppage's statements to

22    the Court show that U.S. Probation simply reports suspected violations based on law enforcement

23    views of the incident, without notifying the courts when they are aware of contrary evidence that

24    casts doubt on the law enforcement account. When asked directly why he didn't include exculpatory

25    evidence in the Form 12, Officer Coppage responded:

26        "[T]hat's not anything that we do. We don't take statements,[19] and we don't add that to the
27        Form 12 because at the end of the day, you have to read all of this; and I guess our

28    ---

[19] As noted supra, Officer Coppage took multiple statements in this case.

purpose and intent is to show there is a charge and based on the AUSA desiring to take steps in order to file those charges, that's who would I guess ultimately be the one to decipher whether there is enough to go on...."

3/10 Tr. at 113:13-21.

This answer reveals a troubling misunderstanding of Probation's role in supervised release revocation proceedings. It is not sufficient for an AUSA to determine that a charge should be brought—it is the Court that determines whether a charge should be brought, and the Court cannot do that without receiving all the relevant information from Probation.

Officer Coppage's response to the Court's hypothetical question was particularly troubling:

**THE COURT:** Let's say that, you know, you have the police report; and the police report includes this description. And then you later see video evidence -- video footage, which directly contradicts what's in the police report. Would you simply submit the police report to me and the description from the police report without noting that you saw video evidence that directly contradicts what's in the police report?
**A.:** I may do that. It's just -- I guess, it just depends on the circumstances.
**THE COURT:** So, you would ask me to find that there is probable cause to believe that somebody committed a supervised release violation based on a police report even if you had seen video which contradicted the allegations in the police report?
**A.:** Well, I guess for me, Your Honor, I'm non-bias in this matter; right. Like, so my whole position is I just simply report to the Court. I'm a reporter.

Tr. 3-10 at 112:16-113:6.

Officer Coppage correctly stated that he is supposed to be a non-biased reporter, but he nonetheless testified that this duty requires that he only give the Court the law-enforcement version of events, without acknowledging the existence of material evidence to the contrary. This Court should dismiss Charge Seven in order to place the U.S. Probation Office on notice that Probation Officers need to be fully candid with the Court and provide all relevant information the Court needs in order to determine whether there is probable cause to believe a violation occurred.

**V.     The Government Has Failed to Prove Charge Seven.**

Charge Seven alleges that Mr. Johnson committed an assault with force likely to produce great bodily injury in violation of California Penal Code § 245(a)(4). Dkt. 394 at 5. The Government has not met their burden to prove this by even a preponderance of the evidence, nor could they prove that he committed the lesser included offense of misdemeanor assault. First, all of Dasia Johnson's statements should be excluded per Mr. Johnson's right of confrontation under due process, as laid out in *United States v. Comito*. Second, even with those statements, the government has failed to meet its

burden to show either that any force Mr. Johnson used was likely to cause great bodily injury, or that his actions were not in self-defense.

### A.   The admission of Dasia Johnson's hearsay statements violates *United States v. Comito.*

As Mr. Johnson explained in advance of the hearing, due process guarantees him "the right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witnesses." *United States v. Comito*, 177 F.3d 1166, 1170 (9th Cir. 1999) (citation omitted); *see also* Dkt. 385 at 10. "This right to confrontation ensures that a finding of a supervised release violation will be based on verified facts." *Id.* at 1170.

*Comito* created a balancing test that courts in this Circuit have followed ever since. It requires the revocation court to "weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Id.* Because the right to confrontation in a revocation hearing is "not static, but is of greater or lesser significance depending on the circumstances[,]" the court must assess the releasee's interest in confrontation by looking at two primary (although non-exhaustive) factors: "the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence." *Id.* at 1171; *see also n.7* (explaining that the two primary factors are a non-exhaustive list).

Here, Charge 7 is almost entirely predicated on the statements of Dasia Johnson. Those statements are in tension: what she told the police in January 2024 is different from what she told the FBI and United States Probation in January 2025. Those statements are also different than what she told the defense investigator in February. 3/10 Tr., at 25-49 (Ma Testimony); 94-108 (Cross of Officer Coppage); 3/11 Tr., at 16-68 (Ballout Testimony); 182-86 (Recross of Officer Coppage).

The Government was required to produce Dasia as a witness so that Mr. Johnson could test her credibility and testimony through cross-examination. They failed to do so, and failed to show good cause for why they did not. Because Dasia was not called as a witness, the admission of her statements violates *Comito*.

#### 1.   Mr. Johnson has a compelling interest in confrontation.

Under the first prong of the *Comito* test, the Court must look to Mr. Johnson's interest in

confronting his accuser. That interest is extremely high: there is little, if any, corroboration of what the Government says occurred outside of Dasia's statements. This case therefore contrasts sharply with *United States v. Hall*, where "the nonhearsay evidence at the hearing was substantial and sufficient to conclusively prove the domestic violence charge," including another witness who testified that he saw the defendant hit the victim, photographs of bruises on the victim's body, and the defendant's own admission to the arresting officer that he had done so. *Hall*, 419 F.3d 980 at 986 (2005). The court in *Hall* expressly distinguished that case from *Comito*, where "the hearsay evidence was *the only evidence* provided for the contested element of the violation and therefore the releasee had 'a very strong interest in demonstrating that the hearsay testimony did not reflect verified fact.'" *Id.* (citing *Comito*, 177 F.3d at 1171) (emphasis added, second set of internal quotation marks omitted)).

### 2. The Government has not provided good cause for denying Mr. Johnson his Confrontation rights.

In *Comito*, the Court rejected the government's claim that it was unable to subpoena the declarant and that she was unwilling to testify out of fear, finding those claims unsupported by the record. 177 F.3d at 1172. In *Hall*, by contrast, the government provided a "good reason for not producing" the accuser: she was a homeless woman who had left her shelter without a forwarding address, and who could not be found "despite substantial efforts to locate her." 419 F.3d at 988.

Here, the Government had no trouble locating Dasia. Officer Coppage and two FBI Special Agents spoke with her on January 30, and multiple times in February and March. Ex. 257; 3/11 Tr. 3-at 139:23-141:5. The reason Dasia did not appear is simple: the Government failed to properly serve her with a subpoena for the March 11th hearing date.

Dasia was understandably concerned about testifying, saying she would prefer to have an attorney advising her. 3/11 Tr. at 156:16-157:9. Understandably, Dasia didn't want to appear and give testimony that could very well expose her to legal liability. *Id.* Thus, the Government needed to properly serve her to compel her appearance. It failed to do so.

Agent Chaneski emailed Dasia a subpoena for the February 24th hearing date, but email service is not proper service, and in any event, the subpoena would have needed to be updated for the March

11th hearing date. 3/11 Tr. at 142:22-144:10. Agent Chaneski went to the San Francisco address on Dasia's driver's license on March 4th, but she was not there, as that is her sister's address, and the bodyworn camera footage shows Dasia lives at a different address in Oakland. 3/11 Tr. at 144:8-24; 145:9-5. Agent Chaneski did not attempt to serve or locate her at that location. *Id*. at 145:24-146:5. FBI Special Agent Watts conducted surveillance on that location on March 6th and did not see Dasia, but that could be because Dasia was out of town for a funeral until March 11. 3/11 Tr. at 150:17-151:23, 152:24-153:4. The Government knew Dasia would be flying back from the funeral on March 11th, but it did not attempt to serve Dasia at the airport. *Id*. at 154:9-17.

The upshot is that, while the Government contacted Dasia multiple times, it attempted to serve her in person only once. Tr. 3-11 at 147:2-12. The Government did call Dasia and ask her to meet so she could be served. *Id*. at 147:10-12. But it is not Dasia's responsibility to make it convenient for the Government to serve her. In sum, this is not a situation where Dasia was impossible to locate or "a fugitive," instead, the facts "only show a [woman] somewhat obstinately insisting upon [her] right to refuse to appear … until personally served." *See Arnsberg v. United States*, 757 F.2d 971, 976–77 (9th Cir. 1985). That is not enough to make a showing of good cause.

### 3. The evidence introduced does not carry traditional indicia of reliability.

Finally, this Court must look to the "traditional indicia of reliability borne by the evidence." *Id*. at 986 (quoting *United States v. Martin*, 984 F.3d 308, 312 (9th Cir. 1993)). The less reliable the evidence—including the extent of its corroboration by other evidence, which is absent here—the less the government is justified in relying on it. *Id.* The form of the evidence here is unsworn verbal allegations—"the least reliable type of hearsay." *Comito*, 177 F.3d at 1171. Importantly, these unsworn verbal allegations are also inconsistent with each other, and inconsistent with the sworn testimony and medical records of the other eyewitness to the entire event, April Daniels.

Nonetheless, the government states that "Dasia's statements to police on January 20, 2024 bear indicia of reliability." Dkt. 424 at 20. They rely on Federal Rule of Evidence 803(2) to note that these are "excited utterances." First, as this Court is aware, the federal rules of evidence do not apply in this proceeding. Second, these are not excited utterances, they occurred after the altercation had

occurred, after Dasia drove to her sister's house and dropped off her daughter, and after paramedics and police responded to the scene, not "while the declarant was under the stress of excitement" caused by the event. Fed. R. Evid. 803(2).

Moreover, as described *supra*, Dasia's statements to the police are not consistent with each other and are entirely inconsistent with the sworn testimony of April Daniels, Dasia's injuries (or lack thereof) on the date of the incident, later statements Dasia made to the FBI and United States Probation, and statements Dasia made to the defense investigator. These statements are not consistent. They are not reliable.

As in *Comito*, then, "[b]ecause the hearsay evidence [will be] important to the court's finding, and because it involve[s] the least reliable form of hearsay, [Mr. Johnson]'s interest in asserting his right to confrontation is at its apogee." *Id*. Dasia's statements must be excluded under *Comito*.

### B.    The Government failed to prove the elements of assault with force likely to produce great bodily injury.

Even if the hearsay statements had been properly introduced, the evidence is still insufficient to show that Mr. Johnson committed assault with force likely to cause great bodily injury. Under California law, to prove this charge, the Government must show that Mr. Johnson:

1.
2.   Did an act that by its nature would directly and probably result in the application of force to a person;
**3.   The force used was likely to produce great bodily injury;**
4.   Mr. Johnson did that act willfully;
5.   When Mr. Johnson acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;
6.   When Mr. Johnson acted, he had the present ability to apply force likely to produce great bodily injury to a person, and
**7.   Mr. Johnson did not act in self-defense.**

*See* Judicial Council of California Criminal Jury Instruction ("CALCRIM") § 875, emphasis added. Regarding the second element, the force used must be sufficiently great that it is "likely to cause great bodily injury." The focus is "on the force used, not the injury actually inflicted." *People v. Johnson*, 244 Cal. App. 4th 384, 396 (2016). As noted above, great bodily injury means significant

1    or substantial physical injury that is greater than minor or moderate harm. CALCRIM § 875.

2        California law places the burden on the *Government* to prove that Mr. Johnson was not acting

3    in self-defense. *See* CALCRIM § 875 (includes absence of self-defense as an element); CALCRIM

4    3470. Mr. Johnson acted in self-defense if he (1) reasonably believed that he and/or someone else

5    were in imminent danger of suffering bodily injury or of being touched unlawfully; (2) Mr. Johnson

6    reasonably believed that the immediate use of force was necessary to defend against that danger; and

7    (3) Mr. Johnson used no more force than was reasonably necessary to defend against that danger.

8    CALCRIM § 3470.

9        The government cannot prove that there was any assaultive conduct by Mr. Johnson which was

10   likely to cause great bodily injury. Further, they cannot prove he did not act in self-defense.

11           **1.    Dasia's statements were inconsistent and do not show that an assault
                      by Mr. Johnson occurred.**

12

13       Dasia's statements were inconsistent, not only between interviews, but also within interviews.

14   She first told the police that her father drew a gun in the car. She first told the police that he pointed

15   it at her. She first told the police that he struck her with it multiple times. She then told the police that

16   he actually struck her with his fists, while holding the gun. She told the police that Mr. Johnson

17   dragged her out of the car and threw her to the ground, and that she lost consciousness. Ex. 31; 3/10

18   Tr. at 28:1-12.

19       When Dasia was interviewed by the FBI and Probation, she changed her story. She said that

20   she and her father tussled over her phone. *See generally* Ex. 257. She said that he did not have a gun.

21   She said that Mr. Johnson grabbed his backpack and got out of the car with his then-girlfriend, April.

22   She said that he snatched her phone. She said that she got out of the car, of her own volition. She said

23   that she argued with Mr. Johnson and had a physical altercation with April. She did not say anything

24   about being dragged out of the car, about being thrown to the ground, or about her father hitting her,

25   either inside or outside the car, in any way. *Id.*, 3/11 Tr. at 183:19-186:16.

26           **2.    No reliable evidence was introduced as to conduct inside the car.**

27       The only evidence introduced at the hearing as to what occurred inside the car was Dasia's

28   statements to the police, which conflict with themselves and her later statements to the FBI and

     Probation, as well as her later statements to the defense investigator. They also conflict with the

sworn testimony of April Daniels. Ms. Daniels testified that there was an argument in the car, that she and Mr. Johnson asked to be let out of the car, but Dasia refused to slow down to let them out. Ms. Daniels testified that Dasia stabbed Mr. Johnson in the shoulder and just kept driving. At the light, Ms. Daniels testified that she jumped out and Dasia followed her, and then Mr. Johnson exited the car. Ms. Daniels stated there was blood all over her face after she exited the car, and that Mr. Johnson took Dasia down to the ground to try to grab the scissors from her. 3/11 Tr. at 123-133:14. The only physical contact between Mr. Johnson and Dasia was to take Dasia to the ground to remove scissors from her hand in response to Dasia stabbing Ms. Daniels in the fact. Ms. Daniels testified that Dasia drove off in the car and that she went to the hospital for treatment for the stab wound to her face. Her medical records were admitted, which shows an injury consistent with what she described. Ex. 259. This version of events is consistent with what Mr. Johnson told his Probation Officer had happened just after the event, which was that Dasia assaulted Mr. Johnson and April. 3/10 Tr. at 88:1-12.

### 3. The limited reliable evidence as to conduct outside the car does not show an assault likely to cause great bodily injury.

The evidence introduced at the hearing as to what occurred outside of the car was: 1. Dasia's statements to the police, which are unreliable, as described *supra*; 2. the bystander video taken by Sara Lee, which shows Dasia on the ground, Mr. Johnson appearing to grab something from one of her hands, and Mr. Johnson pulling Dasia to her feet and moving her to the drivers' side of the vehicle; and 3. Sara Lee's testimony, which was tainted by her misperception that she had witnessed a human trafficking incident, regardless of her own video evidence to the contrary.

The Court should not rely on witness Sara Lee's testimony to find that Valentino Johnson committed an assault, let alone an assault that could cause great bodily injury. Ms. Lee's memory was affected by her incorrect perception that this somehow had to do with human trafficking. *See, e.g.*, 3/10 Tr. at 52:17-20 ("I was worried about her getting dragged back in the car and thought she was maybe getting kidnapped or trafficked. And so, that's why I reported it because I was concerned for the woman."); 52:6-9 ("she seemed like a victim.").

Ms. Lee's bias was first evident when she refused to acknowledge that Dasia had been put onto

the driver's side of the car, not the passenger side. In her memory of the event, a victim of human trafficking was stuffed into the passenger side of the vehicle and kidnapped: the reality that Dasia was put back into the drivers' side of the vehicle and drove that vehicle away from the scene conflicted with that perception. Even after she viewed her own video multiple times on the witness stand, she still could not acknowledge what had actually occurred.[20]

The video captures a portion of the altercation when Dasia is on the ground. Ex. 23. Mr. Johnson grabs at Dasia's hands, he appears to remove something from her hand, and then picks her up and delivers her to the driver's side of the vehicle. At no point in the video does Mr. Johnson hit or punch Dasia. It was only after being confronted with the video she herself had taken that Ms. Lee amended her testimony to claim that all of the hitting and punching occurred exclusively before the video began. 3/10 Tr. at 60:16-61:1. Ms. Lee was so focused on her memory of having witnessed a human trafficking incident that she was unable to acknowledge facts inconsistent with that conclusion on video she herself had taken. The Court cannot rely on that testimony as reliable.

Ms. Lee's testimony not only conflicts with the video she took in the case, but also with the physical evidence. As Officer Ma testified, Dasia had no injuries consistent with being hit or

---

[20] **Q.** That's -- she is getting put into the driver's side of the car?
**A.** I don't recall that.
3/10 Tr. at 56:7-9.
**Q.** Totally. So, based on the video you took it appears -- and you can see the top of the beanie there -- that she is being put into the driver's side of the vehicle?
**A.** That's not what I recall happening.
*Id.* at 56:15-18.
**Q.** Right. And you are not able to say accurately whether it is the driver's side or the passenger's side on the left?
**A.** No. And that wasn't my impression. I was worried she was getting dragged back into the car and taken somewhere.
*Id.* at 60:11-14.
Similarly, Ms. Lee testified multiple times on direct examination that Mr. Johnson punched Dasia while she was on the ground, but the video she took (which shows Dasia on the ground) does not show Mr. Johnson hitting or punching her.
**A.** "I believe I recall he was hitting her and attacking her. She was rolling on the ground."
*Id.* at 51: 21-23.
**Q.** Okay. And you said you saw the male assaulting her. I mean, in what ways did he assault her?
**A.** I didn't catch a lot of it -- I took a video because I was concerned -- but hitting her, punching her while she was on the floor. Looked -- there was like a scuffle but <u>clearly he was the aggressor and she seemed like a victim</u>.
*Id.* at 52:6-9, emphasis added.

30

punched in the face. 3/10 Tr. at 49:10-20.  Moreover, while the video conflicts with Ms. Lee's

testimony, it is consistent with witness April Daniels's testimony – that Mr. Johnson scuffled with

Dasia in order to disarm her, and when he had gotten the scissors, he returned her to the driver's side

of the car, and Dasia then drove away. 3/11 Tr. at 131:10-15.

> **4.      The Government Failed to Prove that Mr. Johnson did not act in self-defense.**

Even if this Court finds that there was an assault outside the car, the Government cannot meet

its burden without establishing what first happened *inside* the car. Ms. Daniels' testimony

demonstrates that Mr. Johnson acted in self-defense. It was Dasia who began the altercation when

she threatened Mr. Johnson with a pair of scissors, stabbed him in the shoulder, and stabbed Ms.

Daniels in the face, which was corroborated by medical records. At that point, Mr. Johnson

reasonably believed that he and Ms. Daniels were in imminent danger of suffering bodily injury or of

being touched unlawfully, and that the immediate use of force was necessary to defend against that

danger. Mr. Johnson and Ms. Daniels tried to exit the car and flee on foot, but Dasia pursued them.

Mr. Johnson then took his daughter to the ground, disarmed her, and placed her back in the vehicle.

Ms. Lee's video actually confirms this account of events: the video shows Mr. Johnson grabbing at

Dasia's hands, removing an object, then placing her back on the drivers' side of the car. The

Government has not introduced any evidence that Mr. Johnson used more force than was reasonably

necessary to disarm Dasia and defend against the danger that Dasia would continue to stab Ms.

Daniels, or stab him. Thus, the Government has failed to prove that Mr. Johnson did not act in self-

defense. *See* CALCRIM § 3470; *see also Comito*, 177 F.3d at 1170 (violation finding must be based

on "verifiable facts"). Even if this Court finds that assaultive conduct occurred outside the car, the

government has failed to prove that Mr. Johnson did not act in self-defense and Charge Seven must

be dismissed.

> **C.      The Government cannot amend the Form 12 to charge a different offense after the close of evidence.**

The Court should reject the Government's argument that Mr. Johnson can be found to have

violated Charge Seven if he committed the offense of misdemeanor assault (Cal. Penal Code § 240),

which was not charged in the Form 12. Dkt. 424 at 16.

1    The Supreme Court has defined certain minimal due process requirements for parole and

2  probation revocations, and the Ninth Circuit has held that Federal Rule of Criminal Procedure 32.1,

3  which applies to federal supervised release revocation, incorporates these same minimal due process

4  requirements. *See United States v. Havier*, 155 F.3d 1090, 1092 (9th Cir. 1998). Among other things,

5  "a defendant is entitled to 'written notice of the alleged violation' at his revocation hearing." *Id*.

6  (quoting Fed. R. Crim. P. 32.1).[21] In *Havier*, the Ninth Circuit held that a revocation petition alleging

7  that the defendant had committed a "crime of violence" was not sufficient to give the defendant

8  notice that he was being charged with aggravated assault (one of several offenses that can constitute

9  a crime of violence). *Id*. at 1091-93. "[W]hen a revocation petition alleges the commission of a new

10  crime and the offense being charged is not evident from the condition of probation being violated, a

11  defendant is entitled to receive notice of the *specific statute* he is charged with violating." *Id*. at 1093

12  (emphasis added). This "guarantees the fairest opportunity for the defendant to isolate the various

13  elements of the crime and present facts in his defense." *Id*. at 1094.

14    The Government argues that the reference to Penal Code § 245(a)(4), assault with force likely

15  to cause great bodily injury, was sufficient to place Mr. Johnson on notice that he was also being

16  charged with committing the lesser included offense of misdemeanor assault (Penal Code § 240).

17  Dkt. 424 at 16. This argument first implicates the same separation of powers concerns described

18  above: Probation brought the petition (at the Government's behest) and the Government is now

19  basically moving, post-hearing, to amend Probation's petition.

20    But this Court does not need to go that far. This argument is directly foreclosed by *Havier*,

21  which held that a defendant is "entitled to receive notice of the *specific statute* he is charged with

22  violating." 155 F.3d at 1093; *see also United States v. Thum*, 749 F.3d 1143, 1147 (9th Cir. 2014)

23  (vacating supervised release revocation that charged 8 U.S.C. § 1324(a)(1)(A)(iv) rather than §

24  1324(a)(1)(A)(ii) under *Havier*). Cal. Penal Code § 240 and § 245(a)(4) are two different statutes.

25  The Government may not charge one and then prove the other.

26    The fact that § 240 is a lesser included offense of § 245(a)(4) is irrelevant. *Contra* Dkt. 424 at

27  _____

28  [21] *Havier* cites to Rule 32.1(a)(2)(A). *See* 155 F.3d at 1092. Rule 32.1 was subsequently amended, such that the quoted language now appears in subsection (b)(2)(A) of Rule 32.1. *See* Fed. R. Crim. P. 32.1(b)(1)(A).

17. *Havier* instructed that there is a requirement to give notice of the specific statute involved in a violation, with no carveout for lesser included offenses. 155 F.3d at 1093. The only case the Government cites to the contrary is from the Eleventh Circuit and not binding upon this Court. *United States v. Dennis*, 26 F.4th 922, 927 (11th Cir. 2022).

Moreover, as a practical matter, the Second Amended Form 12 did not place Mr. Johnson on notice that he was also being charged with a violation of § 240. The Form 12 specified that Mr. Johnson was being charged with "Assault with Force Likely to Produce Great Bodily Injury, ***a felony***." Dkt. 394 at 5 (emphasis added). Thus, the language of the Form 12 affirmatively suggested that Mr. Johnson was *not* also being charged with misdemeanor assault. *See Havier*, 155 F.3d at 1093 (expressing concern that charging one offense and then proving another could affirmatively mislead the defense). And notably, for Charge Five, the petition charged a variety of offenses in addition to forcible rape, including criminal threats and spousal battery. Dkt. 394 at 4. Thus, Mr. Johnson reasonably concluded that if the Government intended to prove another offense in Charge Seven, the petition would have listed that offense.[22]

In sum, *Havier* recognized that the due process requires that the defense is aware of the specific offenses that are the subject of a revocation proceeding. 155 F.3d at 1093. And it acknowledged the risk of prejudice should the defense be misled when one offense was charged and another was proven. *Id*. at 1094. That prejudice was demonstrated in this case. At the hearing, Mr. Johnson's counsel focused on establishing that any force he may have used during the argument with Dasia was minimal—he did not have a gun, and at most, they "tussle[d]." *See* 3/11 Tr. at 184:15-19. This is a defense to assault with force likely to cause great bodily injury. *See* Cal. Penal Code § 245(a)(4). But it is not a defense for simple assault, which does not require any particular degree of force, and is satisfied by any application of force to a person. *See* Cal. Penal Code § 245; CALCRIM

---

[22] The Government argues that the Form 12 placed Mr. Johnson on notice that he was being charged with assault without a weapon because he was not charged under Penal Code § 245(a)(2) (assault with a firearm). Dkt. 424 at 16. That is incorrect. Penal Code § 245(a)(4) is broad enough to apply to assault using a firearm. *Cf. People v. Aguayo*, 13 Cal. 5th 974, 985 (2022) ("force likely assault includes most assaults with a deadly weapon or instrument," suggesting there may be overlap between subsections (a)(2) and (a)(4)). Moreover, the factual allegations underlying the charge in the petition itself mentioned a gun. Dkt. 394 at 5-6. Thus, contrary to what the Government argues, a reasonable person reading the Form 12 could conclude that assault with a gun was the charge.

§ 915. If Mr. Johnson had been charged with both offenses from the start, he would have instead focused more closely on establishing the requirements of self-defense, which disproves both offenses. For all these reasons, the Court should decline to find that Mr. Johnson violated the terms of his supervised release by committing simple assault in violation of California Penal Code § 240.

## VI.  Mr. Johnson Cannot Be Incarcerated Past April 9th Without A Jury Finding of Guilt Beyond A Reasonable Doubt Under *Apprendi*.

As Mr. Johnson explained in his Revocation Brief, *see* Dkt. 385 at 3-10, because the original term for his original offense expires on April 9, 2025, a revocation sentence that incarcerates him past that date without an accompanying finding of fact made by a jury violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[23]

The statutory maximum sentence Mr. Johnson could have received based on his original felon-in-possession offense was 120 months of custody. *See* Dkt. 338 at 5; Ex. G [2018 PSR ¶ 82]. The Court sentenced Mr. Johnson to 114 months, which he has already served. Dkt. 363. And Mr. Johnson has been in custody since October 9, 2024 on the pending Form 12. Thus, Mr. Johnson will have served 120 months in custody on April 9, 2025. The Government urges this Court to re-incarcerate Mr. Johnson for an additional term based on new allegations of fact. But *Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490; *see also Alleyne v. United States*, 570 U.S. 99, 103 (2013) ("any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."). Here, finding the charges in the Form 12 true would allow Mr. Johnson to receive a sentence that is higher than the statutory maximum. Because a jury did not find beyond a reasonable doubt that Mr. Johnson committed the acts charged in the Form 12, he cannot be incarcerated past April 9th.

## CONCLUSION

Mr. Johnson respectfully requests that the Court dismiss Charges Five, Six and Seven in the Amended Form 12.  Because Charges One through Four do not require revocation, and in light of

---

[23] Mr. Johnson acknowledges that binding Ninth Circuit precedent holds otherwise. *See United States v. Henderson*, 998 F.3d 1071, 1074 (9th Cir. 2021). He nevertheless preserves this challenge for appellate review. *Aquino*, 794 F.3d at 1036.

Mr. Johnson's demonstrated need and want for substance abuse treatment, Mr. Johnson respectfully requests that the Court continue his supervision and order his release to an inpatient program.

Dated:    March 25, 2025                    Respectfully submitted,

                                           JODI LINKER
                                           Federal Public Defender
                                           Northern District of California

                                                      /S
                                           _____
                                           GABRIELA BISCHOF
                                           Assistant Federal Public Defender

Dated:    March 25, 2025                    Respectfully submitted,

                                           JODI LINKER
                                           Federal Public Defender
                                           Northern District of California

                                                      /S
                                           _____
                                           SAMANTHA JAFFE
                                           Assistant Federal Public Defender